Danton BURROUGHS, as Executor of the Will of John Coleman Burroughs, Deceased, Hulbert Burroughs, Joanne Pierce Anselmo, James Michael Pierce and Edgar Rice Burroughs, Inc., Plaintiffs,

v.

METRO–GOLDWYN–MAYER, INC. and United Artists Corporation, Defendants.

No. 80 Civ. 2726.

United States District Court, S. D. New York.

June 24, 1980.

Cowan, Liebowitz & Latman, P. C., New York City, for plaintiffs by Roger L. Zissu, Alan Latman, Carol F. Simkin, James F. Lightstone, New York City, of counsel.

Townley & Updike, New York City, for defendants by Douglas C. Fairhurst, Neil J. Rosini, Mitchell R. Berger, New York City, of counsel.

## OPINION

WERKER, District Judge.

This is a motion for a preliminary injunction restraining the production of a motion picture, "Tarzan, The Ape Man," currently being developed for production by defendant Metro-Goldwyn-Mayer, Inc. ("MGM"). A hearing on plaintiffs' application was held on May 23, 27, and 28, 1980, at the conclusion of which the Court indicated it was going to deny the motion. The parties having submitted proposed and counter-proposed findings of fact and conclusions of law, and all of the evidence and arguments having been duly considered, the motion is hereby formally denied. In accordance with Fed.R.Civ.P. 52(a), my findings of fact and conclusions of law, for purposes of this preliminary injunction motion, are as follows.

## FACTS

The individual plaintiffs are heirs of Edgar Rice Burroughs (the "author"), author of "Tarzan of the Apes" and numerous other works chronicling the adventures of Tarzan. Plaintiffs Joanne Pierce Anselmo and James Michael Pierce are grandchildren of Edgar Rice Burroughs, and plaintiffs Hulbert Burroughs and the deceased John Coleman Burroughs are the author's sons. The four heirs held at relevant times what the new copyright law designates as a "termination interest" in the copyright grants executed by the author during his lifetime. 17 U.S.C. § 304(c)(1).

Plaintiff Edgar Rice Burroughs, Inc. ("Burroughs, Inc.") is a California corporation conducting its business from an office in Tarzana, California. Burroughs, Inc. was formed by the author in 1923 and the author assigned all rights in his works to the company. Burroughs, Inc. has functioned ever since as the licensing entity for literary rights and copyrights in the author's works. See PXs 3, 17, 18. Burroughs, Inc. is beneficially owned by the Burroughs heirs.

MGM is a Delaware corporation qualified to do business in New York. It maintains its headquarters in California and is engaged (now through a newly formed subsidiary Metro-Goldwyn-Mayer Film Co.) in the business of producing motion pictures for theatrical and television exhibition. MGM produced its first "Tarzan, The Ape Man" film in 1932, and produced a remake of that film in 1959. MGM is currently in the pre-production stages of its third "Tarzan, The Ape Man" film. Tr. 85, 89, 98.

The defendant United Artists Corporation ("UA") is engaged in the business of distributing motion pictures for exhibition throughout the United States and elsewhere throughout the world. UA serves as exclusive distributor of MGM films in the United States and Canada pursuant to an agreement entered into in October 1973. This agreement expires in 1983, and UA would distribute MGM's new Tarzan film if it is released while the agreement is still in effect. Affid. of Alan A. Benjamin, sworn to May 20, 1980, at ¶¶ 3, 4.

Edgar Rice Burroughs wrote the first of his Tarzan works, "Tarzan of the Apes," in 1912. PX 12. The work was originally published in a periodical called "The All Story" and was first copyrighted by the publisher of that periodical, The Frank A. Munsey Co. PX 1. Munsey subsequently reconveyed all rights in the story, other than serial rights, to Burroughs in 1913. PX 2. In 1923, Burroughs, in turn, transferred all of his rights in "Tarzan of the Apes," including his copyright interest, to his newly formed corporation, Burroughs, Inc. PX 3.

In April 1931, MGM entered into an agreement with Burroughs, Inc. and the author individually under which it acquired from Burroughs, Inc. the right to use the

"Tarzan" character and other characters appearing in the then existing works of Edgar Rice Burroughs in an original story to be written and created by MGM and used as the screenplay for a motion picture.[1] The rights conveyed under this agreement were described by the parties as follows:

Burroughs[, Inc.] hereby gives, grants, sells, assigns, transfers and sets over unto [MGM] the right to create and write an original story, using as one of the characters therein, the character of "TARZAN", which character was originally created by the author, and including also, at the discretion of [MGM], all or any of the other characters used in all or any of the stories heretofore written by the author. [MGM] shall have the right to use as the title of said story any title consisting of more than one word which [MGM] may select, excluding, however, the titles listed in Exhibit "A" attached hereto and made a part hereof, which titles have heretofore been used as titles of stories written by the author.

DX A, at ¶ 1.

Under paragraph 3 of the agreement, Edgar Rice Burroughs, the author, undertook to review the resultant MGM screenplay and to advise MGM if its material conflicted with or infringed upon any of his own works. DX A, at ¶ 3. The agreement also gave MGM the right to produce as many remakes of the first film as it desired, the only limitations being that each successive remake had to be based substantially on the first MGM photoplay, without material changes or departures from the story used in connection therewith, and bear the same title. DX A, at ¶ 14. The two "Tarzan" pictures made by MGM in 1931 and 1959 were made under the 1931 agreement. These two films, as well as the one presently under way at MGM, are based on an original MGM screenplay and are not based on any of the author's Tarzan stories. Tr. 102, 104. The Certificate of Copyright Registration obtained by MGM in 1932 for "Tarzan, The Ape Man," describes the film as being "[b]ased upon the character created by Edgar Rice Burroughs. Adaptation by Cyril Hume. . . . Author of the photoplay Metro Goldwyn Mayer Distributing Corporation." PX 7. The 1931 agreement was the subject of litigation between Burroughs, Inc. and MGM in the early 1960's. *See Edgar Rice Burroughs, Inc. v. Metro-Goldwyn-Mayer, Inc.,* 205 Cal.App.2d 441, 23 Cal.Rptr. 14 (2d Dist. 1962).

MGM began development work on the present "Tarzan, The Ape Man" film sometime prior to January 1980. Tr. 85–87. As the project now stands, MGM has written a first draft of the screenplay, which the writer, Thomas Rowe, is currently revising. Tr. 94. MGM has negotiated a deal with John Derek to produce and direct the film and with Bo Derek to produce and star as "Jane." The deal has been memorialized in a deal memorandum, which has been sent to and is being considered by the Dereks. Tr. 95; DX F. MGM anticipates that shooting on the film will begin in either August or September of this year, and that the film will be released sometime in the summer of 1981. Tr. 97–98. If work on the project were suspended at this point, MGM would in all likelihood lose the project, because the principal star, Bo Derek, is currently "very popular" and MGM could not "hold" a star of her caliber for the duration of this litigation. Tr. 98–99.

On December 12, 1977, John Coleman Burroughs and Hulbert Burroughs, the two sons of the late author, served on Burroughs, Inc. a Notice of Termination, PX 4, of the renewal copyright interest that the family corporation held in the works of the author under the 1923 agreement.[2] The Notice of Termination was sent under sec-

---

1. The agreement provided that in return MGM would pay Burroughs, Inc. a lump sum of $20,-000. The agreement also provided that MGM was to employ the author in an advisory and/or consulting capacity in connection with the writing of the story for a five-week period, and that Burroughs, Inc. was to be paid by MGM $1,000 per week for each week.

2. At the time the Notice was sent, Burroughs, Inc. was beneficially owned by Hulbert Burroughs, John Coleman Burroughs, and the estate of their late sister. Tr. 53–54.

tion 304(c) of the new Copyright Act and purported to terminate Burroughs, Inc.'s interest in the renewal copyrights transferred by the author to the latter in 1923. The notice listed 35 works written by the author. It was recorded in the United States Copyright Office on March 6, 1978.[3] The two sons each held a one-third "termination interest" in the authors' copyrighted works, with the remaining one-third held by plaintiffs Pierce and Anselmo.[4]

Marion T. Burroughs, wife of plaintiff Hulbert Burroughs from 1945–1960 and 1975 to the present, tr. 59, was a director and the chief operating officer of Burroughs, Inc. at the time the Notice of Termination was received. She had been running the company since August 1976. Hulbert Burroughs had managed the company from 1962 to 1967, and served as one of its directors through August 1976. Tr. 34–40, 45–46. When Marion Burroughs received the termination notice on behalf of Burroughs, Inc., she turned it over to the company's lawyers, tr. 56, but did not notify MGM or other parties to whom the company had licensed or granted rights in Tarzan properties, with the exception of Warner Brothers Inc. ("Warner") and Ballantine Books, with whom the company was having contractual dealings. Tr. 56–61.

At no time did MGM receive notice from any of the plaintiffs that its rights under the 1931 agreement to remake "Tarzan, The Ape Man," were purportedly being terminated. Tr. 91–92. MGM did not learn of the 1977 termination notice sent to Burroughs, Inc. until January 1980, after the "termination" purportedly became effective. Tr. 90–91; DXs B, C.

The plaintiffs did notify Warner about the termination notice. Burroughs, Inc. had granted Warner a license in 1973 to make a Tarzan picture of its own, and a memorandum of understanding was signed by Burroughs, Inc. that year. PX 9. Warner was not given formal notice of the termination, but was informed by Burroughs, Inc. before mid-1978 that the 1973 "deal" to do a Tarzan picture would have to be renegotiated in light of the termination. Tr. 56, 134–35.

On December 17, 1979, one day after the effective date of the purported termination of Burroughs, Inc.'s rights, plaintiffs Hulbert Burroughs, Danton Burroughs, Joanne Pierce Anselmo, and James Michael Pierce (all those holding termination rights) reconveyed to Burroughs, Inc. rights in a number of the author's works, including "Tarzan of the Apes." PX 17. The reconveyance was modified by a second agreement dated January 31, 1980. PX 18.

As a result of the termination and reconveyance, all of the "salient points" of the 1973 agreement between Warner and Burroughs, Inc. were renegotiated. Tr. 120–21. Although the plaintiffs and Warner disagree as to whether there is now a signed agreement between them, tr. 58, 140–41, Warner has selected a producer, director, screenplay writer, and an actor to play Tarzan, and has contracted with each of them. Tr. 141–42. Warner's planning of its proposed Tarzan movie, which tentatively has been entitled "Greystoke," has been based on the assumptions that it had exclusive motion picture rights and that no other new Tarzan film was being produced at this time. Tr. 131. While Warner has been negotiating with plaintiffs to obtain exclusive motion picture rights, it has not made a decision as to whether it will proceed with its film without exclusive rights. Tr. 129, 142–44.

## DISCUSSION

The standard in the Second Circuit for the issuance of a preliminary in-

**3.** 37 C.F.R. § 201.10(f)(4) provides that "[r]ecordation of a notice of termination by the Copyright Office is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met."

**4.** The statute provides that where an author is dead, his (or her) termination interest may be exercised by his widow (or her widower) and/or his or her children, provided that the persons exercising the termination own more than one-half of the author's termination interest. 17 U.S.C. §§ 304(c)(1), (2).

junction is "possible irreparable harm and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206–07 (2d Cir. 1979). For the reasons that follow, I hold that plaintiffs have failed to show possible irreparable harm and have demonstrated neither probable success on the merits nor a balance of hardships tipping decidedly in their favor. Accordingly, they have failed to show that they are entitled to a preliminary injunction under the Second Circuit's standard for relief.

The Copyright Act of 1976, Pub.L. No. 94–553, 90 Stat. 2541, increased the duration of subsisting copyrights by 19 years from 56 years to 75 years of protection from the date the copyright was originally secured. 17 U.S.C. § 304(b). Congress determined that there were strong reasons for giving authors and their families who had transferred their copyrights the opportunity to benefit from the extended renewal term. *See* H.R.Rep.No.94–1476, 94th Cong., 2d Sess. 140 (1976). Congress therefore provided authors and certain of their beneficiaries the right to terminate "the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it . . .." 17 U.S.C. § 304(c). *See* 3 *Nimmer on Copyright* § 11.02[A] (1979) ("[T]he termination provisions apply to any 'transfer' of copyright and to nonexclusive licenses of copyright or of any right comprised in a copyright.") (footnotes omitted).

The 1931 agreement between Burroughs, Inc. and MGM granted the latter a license to use the character Tarzan and other characters from the author's works. The agreement did not transfer any copyrights or renewal copyrights or licenses of copyrights; MGM was not given any copyright interests in any of the author's works. The agreement was limited strictly to the right to use characters. It is significant that the last paragraph of the 1931 agreement provides that MGM's rights to use the Tarzan characters were to continue for the full duration of the copyright and renewal copyright of MGM's film. DX A, at ¶ 14. Moreover, the author had the right under the 1931 agreement to examine the screenplay for MGM's film to determine whether MGM's "literary material" in any way infringed upon or conflicted with his stories. DX A, at ¶ 3. The fact that the duration of MGM's rights under the agreement was to be measured by its own copyrights rather than by the copyrights of Burroughs, Inc. and the fact that the author had the right to review MGM's screenplay for conflicting or infringing matter are strong indications that no copyright grant was intended by the 1931 agreement. It is also significant that both the 1931 film and the 1959 remake as well as the film presently under production are based on MGM's original story and not on any of the works of the author. Whether the Tarzan characters appearing in the author's works are copyrightable or not, *see generally* 1 *Nimmer on Copyright* § 2.12 (1979); *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied*, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), it is clear that the 1931 agreement was not intended to, and did not purport to, grant MGM any copyright interest. Hence, the rights granted MGM under the 1931 agreement were not subject to termination under section 304(c).

Even assuming MGM's rights under the 1931 provision were subject to termination under section 304(c), the plaintiffs' purported termination was ineffective because the Notice of Termination was served on Burroughs, Inc. prior to the effective date of the new Copyright Act. The provisions of the new Act, "except as otherwise expressly provided by this Act," took effect on January 1, 1978. 17 U.S.C.Trans. & Supp.Prov. § 102, 90 Stat. 2598. Section 102 provided that sections 118, 304(b) and chapter 8 of title 17 were effective upon the enactment of the Act in October 1976, but made no mention of section 304(c). By its terms, section 304(c) provides that "[t]ermination of the grant *may be effected* at any time during a period of five years beginning at

the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later." 17 U.S.C. § 304(c)(3) (emphasis added). The copyright in question was originally secured in 1912; hence, the five-year period commenced on January 1, 1978. Section 304(c) further provides that "termination *shall be effected* by serving an advance notice in writing upon the grantee or the grantee's successor in title." 17 U.S.C. § 304(c)(4) (emphasis added).

The plaintiffs herein served their Notice of Termination on December 12, 1977, prior to the effective date of the relevant sections of the Act and prior to the commencement of the five-year period in which they could effect termination. The Notice of Termination therefore was a nullity, and it could not have had any legal effect on MGM's rights under the 1931 agreement. Given the clear language of subsections (3) and (4) of section 304(c), the plaintiffs' argument that termination notice could have been properly served prior to January 1, 1978 must be rejected. *See* 3 *Nimmer on Copyright* § 11.06[A], at 11–36 to 11–37 (1979) (conclusion that termination notice could have been served prior to January 1, 1978 leads to "the absurd conclusion that the Act became effective even before it was enacted on October 19, 1976.").

Even assuming the Notice of Termination was effective from January 1, 1978 forward, it could not have affected MGM's rights. As noted above, section 304(c)(4) requires those seeking to invoke the termination provisions to serve "an advance notice in writing upon the grantee or the grantee's successor in title." MGM did not receive any advance notice of the purported termination of its rights under the 1931 agreement; indeed, it did not receive any notice until after its rights had already been allegedly terminated.

Plaintiffs, arguing for a narrow construction of section 304(c)(4), contend that the statute requires notice of termination only on an *author's* grantee. They submit that since the author's grantee in the instant suit was Burroughs, Inc., service upon Bur-

roughs, Inc. alone was sufficient to cut off MGM's rights. I disagree. Under the circumstances of this case, section 304(c)(4) must be construed to have required notice on MGM.

Plaintiffs were or should have been aware of MGM's rights under the 1931 agreement. Hulbert and John Coleman Burroughs, the two heirs who signed the 1977 termination notice, were shareholders of Burroughs, Inc. at that time. Burroughs, Inc. had been involved in litigation with MGM over this very agreement in the early 1960's. The Notice of Termination was served by members of the Burroughs family on the Burroughs family corporation; hence, plaintiffs were essentially serving themselves. This notice, without any prior notice to MGM, was not sufficient to cut off the rights that had been granted to MGM by Burroughs, Inc.

Professor Nimmer is apparently in agreement with this construction of the statute. He writes in his treatise:

> If the grantee has transferred some but not all of the rights that he or she acquired under the grant, whether the original grantee, his or her successor with respect to some of the rights, or both, must be served will turn on which rights are purportedly terminated under the termination notice. *If all the rights are being terminated, all of the persons who own any portion of such rights must be served in order to effectuate the termination.*

3 *Nimmer on Copyright* § 11.06[B], at 11–38 (1979) (emphasis added).

The December 1977 Notice of Termination also fails to comply with the regulations promulgated under 17 U.S.C. § 304(c)(4)(B). A termination notice must include "[t]he name of each grantee whose rights are being terminated, or the grantee's successor in title . . . ," and "[a] brief statement reasonably identifying the grant to which the notice of termination applies . . . ." 37 C.F.R. §§ 201.-10(b)(1)(i), (iii). The statement must be "complete and unambiguous . . . without incorporation by reference of infor-

mation in other documents or records." 37 C.F.R. § 210.10(b)(2).

Plaintiffs' purported Notice of Termination did not include the name of any grantee except Burroughs, Inc. It made no mention of MGM. Moreover, the Notice listed 35 works written by the author to which the termination of rights purportedly applied. *See* PX 4. This list, however, failed to include five titles written by the author prior to 1931, titles from which MGM could take characters in accordance with paragraph 1 of the 1931 agreement. *Compare* PX 4 *with* DX A, exh. A.[5] Since the Notice did not include these five titles, and since the "statement . . . identifying the grant to which the notice of termination applies" is to be "complete and unambiguous," the Notice is deficient as to these five titles. Such a deficiency is not "harmless error"; it undoubtedly "materially affect[s]" the adequacy of the Notice. *See* 37 C.F.R. § 201.10(e)(1).

To summarize, plaintiffs' Notice of Termination had no effect on MGM's rights under the 1931 agreement because: (1) the agreement did not purport to grant any copyright interest terminable under section 304(c); (2) the Notice was served prior to the effective date of the new Act; (3) MGM was not given advance notice of the purported termination of its rights; and (4) the Notice failed to designate MGM and omitted five titles from which MGM could draw characters. Hence, plaintiffs certainly have failed to demonstrate a reasonable probability of prevailing on the merits. Although plaintiffs have raised sufficiently serious questions going to the merits to make them a fair ground for litigation, they have not demonstrated that the balance of hardships tips decidedly in their favor. Indeed, plaintiffs have failed to show the possibility of irreparable harm. In arguing otherwise, plaintiffs rely on cases holding that irreparable injury can be presumed when a copyright is infringed. *See, e. g., Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1094 (2d Cir. 1977); *Wainwright Securities Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 94 (2d Cir. 1977). This presumption, however, only applies where a plaintiff makes out a *prima facie* case of copyright infringement, that is, where he demonstrates probable success on the merits. *See Novelty Textile Mills, Inc.*, 558 F.2d at 1094; *Wainwright Securities Inc.*, 558 F.2d at 94. Plaintiffs herein have not made such a showing, and irreparable injury cannot be presumed. In any event, it is far from clear that the proposed Warner Tarzan movie will fall through if Warner does not have exclusive film rights.[6] That decision still remains to be made. If a preliminary injunction is not issued, Warner may nevertheless choose to proceed with its film. On the other hand, if a preliminary injunction is issued at this point, for all intents and purposes MGM will have lost this case on the merits, for it will not be able to proceed at all and it will undoubtedly have to abandon its Tarzan project.

## CONCLUSION

In accordance with the above, the motion for a preliminary injunction is denied.

So ordered.

---

5. Exhibit A to the 1931 agreement includes the following five titles which are not listed in the Notice of Termination: "The Son of Tarzan," "Tarzan, Lord of the Jungle," "Tarzan, Guard of the Jungle," "The Tarzan Twins" and "Tarzan and the Ant Men."

6. Although Warner has assumed that it will have exclusive film rights, it is significant that it does not yet have exclusive rights. Warner and plaintiffs have been engaged in negotiations since the purported termination of Burroughs, Inc.'s copyright interests.