Danton **BURROUGHS** as Executor of the Will of John Coleman Burroughs, Deceased, Hulbert Burroughs, Joanne Pierce Anselmo, James Michael Pierce, and Edgar Rice Burroughs, Inc., Plaintiffs,

v.

**METRO–GOLDWYN–MAYER, INC.** and United Artists Corporation, Defendants.

No. 80 Civ. 2726 (HFW).

United States District Court, S. D. New York.

July 10, 1981.

Cowan, Leibowitz & Latman, P. C., New York City, for plaintiffs; Roger L. Zissu, Alan Latman, Carol F. Simkin, James Lightstone, New York City, of counsel.

Townley & Updike, New York City, for defendants; Douglas C. Fairhurst, Neil J. Rosini, Robin Bierstedt, New York City, of counsel.

## OPINION

WERKER, District Judge.

Plaintiffs commenced this action against defendants for copyright infringement arising from defendant MGM's 1981 remake of the film "Tarzan, The Ape Man." This case is currently before the Court on cross-motions for summary judgment. The parties previously were before the Court on plaintiffs' application for a preliminary injunction restraining production of the film. That motion was denied in an opinion dated June 24, 1980. *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 491 F.Supp. 1320 (S.D.N.Y.1980), *aff'd*, 636 F.2d 1200 (2d Cir. 1980). Reader familiarity with that decision and the facts set forth therein will be assumed.

Plaintiff has moved for summary judgment on the issue of whether the 1931 agreement between Burroughs, Inc. and MGM granted a "right under" copyright. Defendant has cross-moved for summary judgment on the issues of whether the 1931 contract grants a "right under" copyright and whether the attempted termination of MGM's rights under § 304 of the Copyright Act, 17 U.S.C. § 304(c) was ineffective. Both parties contend that there are no questions of material fact as to any of these issues.

## FACTS

Edgar Rice Burroughs, (the "author") wrote the first of his Tarzan works "Tarzan of the Apes," in 1912. In 1923, Burroughs transferred all of his rights including his copyright interest in "Tarzan of the Apes" to Edgar Rice Burroughs, Inc. ("Burroughs, Inc."). Burroughs, Inc. was formed by the author in 1923 and is now beneficially owned by the individual plaintiffs, the Burroughs heirs. Since 1923, Burroughs, Inc. has functioned as the licensing entity for literary rights and copyrights in the author's works.

In April, 1931, MGM entered into an agreement with Burroughs, Inc. and the author individually, under which MGM acquired the right to use the Tarzan character and other characters appearing in the then existing works of the author in an original story to be created by MGM as a screenplay for a motion picture. MGM also acquired the right to produce remakes of the first film. The only limitation placed on this right was that each remake had to bear the same title as the original MGM film and had to be based substantially on the first MGM photoplay, without material changes or material departures from the original MGM story line.

In 1932, MGM released its first Tarzan movie. The movie was based on an original MGM screenplay utilizing Tarzan and other characters created and developed in the books of Edgar Rice Burroughs. In 1959, MGM issued a remake of the film "Tarzan,

The Ape Man."[1] On December 12, 1977, John Coleman Burroughs and Hulbert Burroughs, the two sons of the late author, served on Burroughs, Inc. a Notice of Termination of the renewal copyright interest that the family corporation held in the works of the author under the 1923 agreement. The notice was sent under section 304(c) of the new Copyright Act, 17 U.S.C. § 304(c), and purported to terminate the Burroughs corporation's interest in the renewal copyrights transferred to it by the author in 1923. The notice listing 35 of the author's works was filed in the United States Copyright Office on March 6, 1978. The two sons each held a one-third termination interest in the authors' copyrighted works, with the remaining one-third interest held by plaintiffs Pierce and Anselmo.

Marion T. Burroughs, a director and the chief operating officer of Burroughs, Inc., received the termination notice on behalf of Burroughs. She subsequently turned it over to the corporation's attorneys but neither she nor corporate counsel notified MGM of the purported termination of Burroughs, Inc.'s rights in the works of Edgar Rice Burroughs. MGM did not learn of the 1977 termination sent to Burroughs, Inc. until January 1980, after the termination purportedly became effective. By that time MGM already had commenced development work on the present "Tarzan, The Ape Man" film.

## SUMMARY JUDGMENT

On a motion for summary judgment, a court's function is not to adjudicate issues of fact, but to " 'determine whether there are issues to be tried.' " *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978), (quoting *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d

272, 279 (2d Cir. 1967), *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972). In determining whether genuine issues of material fact exist, the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *FLLI Moretti Cereali v. Continental Grain Co.*, 563 F.2d 563, 565 (2d Cir. 1977). The burden is on the moving party to show the absence of dispute as to any material fact. *Id.* at 565. Viewing the facts in the light most favorable to the party opposing the various motions, it nevertheless appears that no genuine issue exists as to the material facts, and disposition of these issues by summary judgment is warranted.

### RIGHT UNDER COPYRIGHT

Analysis of the issue of whether the rights granted to MGM under the 1931 agreement constitute rights under copyright within the meaning of 17 U.S.C. § 304(c) must begin with an examination of the agreement itself and of the statute under which plaintiffs attempted to terminate MGM's contractual rights.

The rights conveyed to MGM were set forth in ¶ 1 of the agreement. It provides:

> Burroughs hereby gives, grants sell, assigns, transfers and sets over unto [MGM] the right to create and write an original story, using as one of the characters therein, the character of "Tarzan", which character was originally created by the author and including also, at the discretion of [MGM], all or any of the other characters used in all or any of the stories heretofore written by the author....

DX A, ¶ 1.

Section 304(c) of the Copyright Act permits an author or his heirs to terminate transfers and licenses covering extended copyright renewal terms. The section provides:

---

1. The 1959 film was the subject of litigation before the California courts. The issue involved in that case was whether the 1959 film was based substantially upon the same story used in the 1932 photoplay and whether the 1959 film contained material changes or material departures from the 1932 film. The Court held that differences and changes that were the result of updating, modernizing and adapting the original story were not material or substantial in nature as long as the locus of the play, the order of sequence, the development of the plot, and the theme, thought and main action of the story are preserved." *Edgar Rice Burroughs, Inc. v. Metro-Goldwyn-Mayer, Inc.*, 205 Cal.App.2d 441, 23 Cal.Rptr. 14, 18 (1962).

In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, ... the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, ... is subject to termination ...

It is undisputed that the 1931 agreement between Burroughs, Inc. and MGM granted MGM a nonexclusive license to use the character Tarzan and other characters from the author's works. The agreement did not transfer a copyright or the renewal copyright in Burroughs "Tarzan of the Apes" to MGM. Indeed, it was understood that MGM would obtain its own copyright in the film it developed. The agreement further provided that the author would review MGM's screenplay to determine whether it in any way infringed upon or conflicted with his books.[2]

■ Section 304(c) provides that with respect to copyrights subsisting in their renewal term on January 1, 1978, the exclusive or nonexclusive grant of a license of any right under the renewal copyright is subject to termination in the manner specified. In this case, Burroughs, Inc.'s copyright in "Tarzan of the Apes" was in its renewal term in 1978. MGM held a nonexclusive license to use the Tarzan characters. Thus the only question is whether this license was a right under the renewal copyright. For the reasons that follow, I conclude that the license was of a right under the renewal copyright.

The renewal copyright held by Burroughs, Inc. was in the literary work "Tarzan of the Apes." The copyright covered the work as an entirety. It cannot be said that such a copyright contemplates protection of only the plot, leaving the characters free for public exploitation for, as in the case of plays, the "characters and sequence of incident [are] the substance." *Nichols v.*

Universal Pictures Corp., 45 F.2d 119 (2d Cir. 1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931); see *Filmvideo Releasing Corp. v. Hastings,* 509 F.Supp. 60 (S.D.N.Y.1981). As noted by Judge Learned Hand in *Nichols,* however, it is only well-developed characters that are subject to copyright protection.

■ Thus, in the case at bar, characters that are well-delineated in the Tarzan works of Edgar Rice Burroughs are protected from infringement by the copyright in the work itself. Since appropriation of a well-delineated character contained in copyrighted works without the copyright proprietor's authorization would constitute infringement, it must be concluded that the grant by which one acquires the right to use that character constitutes a right arising under copyright within the meaning of § 304(c).

■ The only issue remaining is whether any of the characters MGM was entitled to use under its license were sufficiently delineated by the author to be copyrightable. It is beyond cavil that the character "Tarzan" is delineated in a sufficiently distinctive fashion to be copyrightable. *See Edgar Rice Burroughs, Inc. v. Mann Theatres,* 195 U.S.P.Q. 159 (C.D.Cal.1976); Brylawski, *Protection of Characters—Sam Spade Revisited,* 22 Bull. Copyright Soc'y 77, 83–84 (1974). Tarzan is the ape-man. He is an individual closely in tune with his jungle environment, able to communicate with animals yet able to experience human emotions. He is athletic, innocent, youthful, gentle and strong. He is Tarzan. Having found that the character Tarzan is copyrightable, I must conclude that the termination provisions of § 304(c) of the Copyright Act of 1976 apply to MGM's license.

## TERMINATION

■ The events surrounding the purported termination of MGM's rights under the

---

2. Based upon the foregoing provisions of the 1931 agreement, this court opined, on the motion for a preliminary injunction, that the 1931 agreement was not intended to, and did not purport to, grant MGM any copyright interest. The Court, however, held that even if MGM's rights under the 1931 agreement were subject to termination under § 304(c) of the Copyright Act, the purported termination was a nullity because the Burroughs heirs did not comply with statutory procedures in effecting termination and, indeed, attempted to assert the right granted before the effective date of the statute.

1931 agreement are undisputed. The only issue of fact advanced by plaintiff in opposing this motion is the question of the heirs' knowledge of MGM's rights. On the motion for a preliminary injunction, however, the court found as a matter of law that the heirs should have known of MGM's rights under the 1931 agreement. The only other issues raised by plaintiff in opposing the defendant's motion for summary judgment on the termination question are those related to the proper interpretation of § 304(c). These involve questions of law for the court to decide. For the reasons stated in my opinion dated June 24, 1980, I hold that the purported termination by the Burroughs heirs of MGM's rights under the 1931 agreement was a nullity.

## PLAINTIFF'S MOTIONS

While the motions for summary judgment were under consideration by the court, plaintiff moved by order to show cause for an order enjoining defendants from releasing and distributing the 1981 MGM film, "Tarzan, The Ape Man," on the scheduled July 24, 1981 release date pending disposition of this action on the merits, whether by way of summary judgment or trial on the merits. Plaintiff also moved by order to show cause for an order pursuant to Fed.R.Civ.P. 37 compelling defendants to produce for viewing MGM's 1981 film, "Tarzan the Ape Man" and related publicity materials. In addition, plaintiff's sought leave to amend their complaint to add claims for trademark infringement and unfair competition.

A hearing on these motions was held on July 2, 1981. At that time, the Court informed the parties that it had decided the motions for summary judgment as discussed above and that a formal opinion would follow. The court also stated that, in its view, the only issue left in the case was that of whether MGM had breached its 1931 agreement with Burroughs, Inc. in its 1981 remake of "Tarzan, The Ape Man." The court stated that it deemed the complaint to have been amended to assert a claim for breach of the contract and indicated that it would not grant a motion to amend on the trademark infringement and unfair competition claims. The motion for leave to amend the complaint to add a claim for trademark infringement and unfair competition is hereby formally denied.

With the agreement of the parties, it was decided at the hearing that the best way to decide the contract claim would be for the court to view the 1931, 1959 and 1981 films to examine whether the 1981 film was based substantially on the 1931 film and whether it contained material changes or departures from the 1931 film. Tr. at 13–14, 17. Based upon defendant's representation at the hearing that MGM's "Tarzan, The Ape Man" films, including the 1981 film, would be available for viewing by plaintiffs and the court and that publicity materials would be made available to plaintiffs by MGM, the motion for an order compelling production of these materials is hereby dismissed as moot.

## BREACH OF CONTRACT

The 1931 agreement provides as follows:

... Metro agrees ... that all 'remakes' of the first photoplay produced by it hereunder, as well as all other photoplays produced by it hereunder subsequent to the making of said first photoplay, shall be based substantially upon the same story as that used by Metro in connection with said first photoplay and that in such subsequent remakes and/or additional photoplays there will be no material changes or material departures from the story used in connection with said first photoplay ....

Ex. A to Plaintiffs' Motion for Summary Judgment, ¶ 14.

In deciding whether disposition of the breach of contract claim by way of summary judgment is appropriate, I must first determine whether the language of this provision is ambiguous so that resort to other evidence to ascertain its meaning is required. *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975). After examining this provision as well as the remainder of the 1931 agreement, I must conclude that the language used in this provision of the contract is clear and unambiguous and that there is

no conflict between this provision and other provisions of the agreement. *See Edgar Rice Burroughs, Inc. v. Metro-Goldwyn-Mayer, Inc.*, 205 Cal.App.2d 441, 23 Cal. Rptr. 14, 18 (1962). I further conclude that the question of whether a breach of the contract occurred may be decided as a matter of law since, in my opinion, no reasonable jury could conclude that the film as edited is not based substantially on the 1931 photoplay and that there are material changes or departures from that film in the 1981 remake.

After viewing the films in question, I must conclude for the reasons that follow that MGM's 1981 remake of the film "Tarzan, The Ape Man" is based substantially on the 1931 photoplay and that there are no material changes or material departures from the story used in that photoplay. My analysis will focus on the story line as well as the portrayal of the characters and their relationships.

The 1931 photoplay is based on the story of an explorer, James Parker, whose daughter Jane joins him in Africa. The movie opens with Jane's arrival and her father's decision shortly thereafter to set off on a safari in search of the fabled "elephants' graveyard" for ivory. In this film, Parker is portrayed as a strong man and Jane as his admiring daughter. There is a suggestion of sexuality in their relationship. The expedition consists of Parker, Jane, Parker's partner Harry Holt, and several natives. On the journey, the party is faced with nearly insurmountable struggles with nature. For example, Jane almost falls off a cliff in the scene of the party crossing the escarpment and Holt is nearly devoured by crocodiles as the party crosses a river on rafts. It is the scene where the party crosses the escarpment that Tarzan's cry is heard for the first time.

After the party crosses the river, Jane is terrorized by an attacking animal and Tarzan appears from the jungle to rescue her. He carries her off and at this point, Jane discovers that Tarzan is human. She gradually begins to trust him and they appear to fall in love. After a brief stay with Tarzan in which Jane seems quite content, she is found by her father and Holt. They are exceedingly distrustful of the ape-man. She rejoins the safari and the group sets out again for the elephants' graveyard. While enroute, the party falls prey to a tribe of pygmies and they are threatened with death when they are thrown into a pit with a huge gorilla. Tarzan, of course comes to their rescue. Holt, Parker, Jane and Tarzan then follow a wounded elephant to the elephants' graveyard where Parker dies. Jane decides to stay with Tarzan and Holt returns to civilization.

In the 1981 film, the story similarly opens with Jane's arrival at her father's camp in Africa. This time, however, Parker is a professional adventurer rather than an explorer. He is a strong man and a bit more eccentric than in the first film. Jane, though admiring, is more hostile towards her father. There again is an element of sexuality in their relationship. As in the 1931 photoplay, shortly after Jane's arrival, Parker, Holt, Jane and some natives set out on an expedition to find the elephants' graveyard. While on the journey, the group hears Tarzan's cry and in contrast to the 1931 film, this time Parker speculates that this is the famed 100 foot ape-man. Jane again is imperilled by wild animals enroute and rescued by Tarzan. Holt and Parker are highly distrustful of Tarzan as they were in the original film, but Jane again perceives that he is human. Although his initial encounter with Jane is brief, Tarzan clearly is fascinated by her. He later captures her while she is swimming in a river. She gets away from him, but is then attacked by a snake. As in the original photoplay, Tarzan comes to her rescue. It is at this point that Jane becomes enamored of Tarzan. After what seems to be a couple of days, Parker finally finds his daughter and she rejoins the safari. The group is soon attacked by an African tribe, however, and Tarzan comes to their rescue. Parker nevertheless dies at the hands of the ivory king and Jane and Tarzan leave Holt to live together in the wild.

While there are some differences between the films in the jeopardies and dramatic sequences employed, as well as in the emphasis accorded different elements of the

story, they are insufficient to warrant the conclusion that this Tarzan movie is not based substantially upon the 1931 story. The use of the phrase "based substantially" contemplates some deviation from the original story. In addition, the fact that the contract prohibits only material departures and material changes demonstrates that changes and departures were in fact contemplated by the parties.

Plaintiffs argue that the changes and departures in the 1981 photoplay are material. Their principal contention is that the film is no longer suitable for young children. Considering the shift in social mores over the half century from 1931 to 1981, I simply cannot agree that a change of the nature complained of constitutes a material change from the 1931 photoplay. Indeed, the 1931 film itself contained scenes which for its time were rather suggestive. As noted by another court that has had occasion to interpret this contract, the contractual language contemplates variations "resulting from updating, modernizing and adapting the original story natural and inherent in, and concomitant with, the right to remake the first photoplay and the right to produce additional photoplays based on the original story." *Edgar Rice Burroughs, Inc. v. Metro-Goldwyn-Mayer, Inc.*, 205 Cal.App. 441, 23 Cal.Rptr. 14, 18 (1962); *see* Ex. A to Plaintiff's Motion for Summary Judgment, ¶ 5. In addition, it appears that changes inherent in modernizing the film and making it saleable in today's market were even contemplated by Burroughs, Inc. In a letter dated November 17, 1970 from Robert M. Hodes, then vice president of Burroughs, Inc. to David Jacobsen, president of MGM Merchandising Corporation, concerning "possibilities" for production of a Tarzan motion picture, Hodes stated:

TARZAN doesn't die. What dies is the particular *creative approach* to the property.... [E]ven MGM has fallen into the same trap of imitating rather than innovating.... [W]hen times [change], [the] pictures [must] change. The world of the 1970's ... cries out for the NATURAL MAN.... There's your next Tarzan cycle: A series of films dealing with a superb, natural man who rejects civilization in favor of a life in complete harmony with nature.... He creates his own values.... We are changing nothing of the thought of Edgar Rice Burroughs. This was his only theme.... The first four TARZAN novels [are] *the* best selling works of fiction in France.... We are selling these books not to children, but to adults—intellectuals, university students.... I want to do the next film with MGM. Essentially, I am talking more of the merchandising business than the film business, for a TARZAN picture for adults is nothing more than a wild merchandising idea....

Ex. 19 to Defendant's Motion for Summary Judgment (emphasis in original).

Since the overall theme of the 1981 film, development of the plot, order of sequence and locus of the 1981 photoplay as edited conform to the 1931 photoplay, I can only conclude that the storyline in the 1981 film is based substantially on the 1931 film and does not contain material departures or changes from that photoplay.

## THE MOTION FOR A PRELIMINARY INJUNCTION

By the order to show cause dated June 23, 1981 plaintiffs' requested preliminary injunctive relief restraining release and distribution of the 1981 film pending resolution of this case on the merits. In view of the court's determination that the motions for summary judgment did not dispose of all issues in the case, plaintiffs' motion for a preliminary injunction enjoining release of the film pending a resolution on the merits must be deemed to continue. In view of my decision on the merits of this action, the motion for an injunction restraining defendants' from releasing the 1981 film pending resolution of the merits of this action is hereby dismissed as moot. In addition, since I have concluded that the 1981 film as edited is based substantially on the 1931 film and does not contain material changes or material departures from the 1931 film, an injunction permanently restraining release and distribution of the film will not be issued. Finally, no stay pending appeal will be granted.

SO ORDERED.