683 F.2d 610
 215 U.S.P.Q. 495, 1982 Copr.L.Dec. P 25,406
 Danton BURROUGHS, as Executor of the Will of John Coleman
Burroughs, Deceased, Hulbert Burroughs, Joanne Pierce
Anselmo, James Michael Pierce and Edgar Rice Burroughs,
Inc., Plaintiffs-Appellants, Cross-Appellees,
v.
METRO-GOLDWYN-MAYER, INC. and United Artists Corporation,
Defendants-Appellees, Cross-Appellants.
 No. 220, Docket 81-7506.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 4, 1981.
Decided May 26, 1982.
 
 Roger L. Zissu, New York City (Alan Latman, Carol F. Simkin, James F. Lightstone, Cowan, Liebowitz & Latman, P. C., New York City, on the brief), for plaintiffs-appellants, cross-appellees.
 Douglas C. Fairhurst, New York City (Robin Bierstedt, Townley & Updike, New York City, on the brief), for defendants-appellees, cross-appellants.
 Before NEWMAN and KEARSE, Circuit Judges, and EGINTON, District Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 This is an appeal by plaintiffs, who are the heirs of author Edgar Rice Burroughs ("Burroughs") and Edgar Rice Burroughs, Inc. ("ERB, Inc."), the corporation Burroughs formed to own, license, and control the rights in his literary works, from a judgment of the United States District Court for the Southern District of New York, Henry F. Werker, Judge, entered on cross-motions for summary judgment, denying plaintiffs' request for injunctive relief and dismissing the complaint. 519 F.Supp. 388. Plaintiffs contended that the 1981 film Tarzan, the Ape Man, produced by defendant Metro-Goldwyn-Mayer, Inc. ("MGM"), infringed their rights under the Copyrights Act of 1976 (the "Act"), 17 U.S.C. §§ 101-810 (1976), and breached the provisions of a license agreement dated April 15, 1931 ("1931 Agreement"), between ERB, Inc., and the predecessor of MGM. The district court ruled (1) that although the 1931 Agreement granted MGM a right under copyright that was subject to termination under sec. 101, § 304(c) of the Act, 17 U.S.C. § 304(c), the purported termination of MGM's rights was ineffective, and (2) that MGM's 1981 film complied with the terms of the 1931 Agreement. Plaintiffs challenge all of the court's rulings except that which concluded that the 1931 Agreement granted a right under copyright and hence was terminable under the Act; the latter ruling is challenged by the defendants on cross appeal.
 
 
 2
 Because we conclude that MGM's 1981 film is not substantially similar to plaintiffs' copyrighted work except to the extent permitted by the 1931 Agreement, and because we agree that the film complied in other respects with the 1931 Agreement, we affirm.
 
 I. FACTS
 
 3
 In this literary version of the eternal triangle, the central characters are two films and a book. The factual controversy concerns the extent to which MGM's 1981 film, Tarzan, the Ape Man ("1981 film"), is similar to an MGM film of the same title produced in 1932 ("1932 film") and differs from the original "Tarzan" book written by Burroughs, entitled Tarzan of the Apes (the "Book"). Our story begins in 1912.
 
 A. The Original Book
 
 4
 Burroughs's Book, Tarzan of the Apes, was first published in the October 1912 issue of The All Story magazine. The copyright was registered in the name of The Frank A. Munsey Co., the magazine's publishers, and was assigned to Burroughs in 1913.
 
 
 5
 The Book tells the story of Tarzan, an extraordinary character combining the best attributes of civilized man and jungle beast. Tarzan is born in a cabin on the west coast of Africa to English parents, John Clayton, Lord Greystoke, and his wife, Lady Alice, who have been marooned there by mutineers. On the death of his parents when he is only a year old, Tarzan (who has thereby inherited the title, "Lord Greystoke") is adopted by Kala, a "great anthropoid ape," and raised as a member of her tribe. Through his upbringing he learns the skills necessary for survival in the jungle, including phenomenally keen senses, the ability to travel quickly from branch to branch through the trees, the language of the apes, and a thorough knowledge of his jungle environment. Blessed with remarkable intelligence, he teaches himself to read and write English (but not to speak it or to understand it when spoken) from the books in the cabin where he was born. With luck and reason, he learns to use a knife, a bow and arrow, and paper and pencil. Although originally scorned by most of his tribe, he overcomes the many perils he faces, ranging from tigers,[1] to gorillas, to native warriors. By the time he reaches maturity his physical prowess coupled with his superior intellect is more than a match for the greater brute strength of the apes, and he becomes "king of the Apes" when he fights and kills Kerchak, the previous king. Soon after his succession, however, he tires of the kingship, and renounces it for the freedom to be near his oceanside cabin and to enjoy the peace and solitude it offers.
 
 
 6
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 7
 Tarzan's peace and solitude are broken by the arrival of a party from the outside world. An American, Archimedes Q. Porter, a stereotypical absent-minded professor who has conducted a highly uncharacteristic and unexpectedly successful search for Spanish treasure, is marooned on the beach and robbed of his treasure by the mutinous crew of his chartered ship, the Arrow. With Porter are his secretary, friend, and assistant, Samuel T. Philander; his daughter, Jane; Jane's would-be suitor, William Cecil Clayton ("Clayton"); and her servant, Esmeralda. Porter, an elderly white-haired man, describes himself as a "highly respectable and erudite scholar( )." 24 All Story at 312. Jane, however, describes him as "so impractical," safe only when chained to a tree, id. at 298, and notes that he "cannot differentiate between erudition and wisdom," id. at 314.[2] Philander, also elderly, is only slightly more practical than Porter. Jane is a beautiful but somewhat demure blonde girl of about nineteen, intelligent, generally practical (although an unashamed romantic at times), devoted to her father, and very much concerned with following the proper and honorable course. Tarzan falls in love with her practically at first sight and leaves a note for her declaring his love. Clayton, who also is in love with Jane, is a wealthy English nobleman, the only son of the then-presumed Lord Greystoke who assumed that title after the disappearance of the prior Lord Greystoke, his brother. Clayton is, in fact, Tarzan's cousin, Tarzan being the true Lord Greystoke. Esmeralda, a 280-pound black, exists primarily for comic relief, fainting when frightened and uttering malaprops when conscious.
 
 
 8
 After the mutineers abandon the Porter party on the beach, they sail away with the Spanish treasure that the expedition has discovered. Shortly, however, the mutineers sight smoke from another ship, and, unbeknownst to the Porter party, several members of the crew return to shore to bury the treasure. Tarzan witnesses the entire episode, and when the sailors reboard the ship and sail away, he unburies the treasure and removes it to a new hiding place in the jungle.
 
 
 9
 Knowing nothing of Africa, Porter and his party are unable to fend for themselves, and are in constant danger from the jungle beasts. They stay in Tarzan's cabin, which they understand belongs to "Tarzan of the Apes" because of a note he has posted on the door advising them to be careful of his belongings. In the cabin, they discover the skeletons of Lord and Lady Greystoke, whom they identify as that long-lost couple by means of the Greystoke ring which Clayton recognizes on his long-dead uncle's finger. Tarzan feeds and protects the entire party, rescuing each of them from near-certain death at one point or another. For example, he kills one lion in defense of Clayton, saves Porter and Philander from another lion, and kills a tiger that is attacking Jane and Esmeralda. Porter and his party do not identify their savior as "Tarzan of the Apes," however, since Tarzan is unable to speak English or to understand it when spoken, and they assume that the person who has posted the note on the cabin door has that ability.
 
 
 10
 In the Book's central incident, Jane is kidnapped by Terkoz, a cruel ape who has been banished from Tarzan's former tribe. Hearing her screams, Tarzan comes to the rescue, kills Terkoz, and takes Jane to a clearing in the jungle where he feeds and comforts her. She speaks to him, but they cannot communicate except by signs. He gives her a locket that he has discovered in his cabin, and she finds that it contains miniatures of Lord and Lady Greystoke. He prepares a bed and a rough shelter for her in the clearing, and before she goes to sleep he gives her his knife to assure her that she has nothing to fear from him. For her protection he sleeps on the ground at the entrance of the shelter. In the morning he returns her to the cabin, and as they part she declares her love for him, still not knowing him to be the author of the notes left at the cabin.
 
 
 11
 While Jane is with Tarzan, a French cruiser, which has captured the Arrow and learned the fate of the Porter party, arrives to rescue the group. Porter, Clayton, two French officers, and twenty men, unaware of Jane's escape from Terkoz, set off into the jungle in search of her. There they are ambushed by cannibals, and Lt. Paul D'Arnot, one of the ship's officers, is wounded and captured. Tarzan, having returned Jane to the cabin and hearing the gunshots, hurries to assist, and saves D'Arnot at the last moment. While D'Arnot is recuperating under Tarzan's care in the jungle, the rest of the party, unaware of the rescue, also attempts to rescue D'Arnot from the cannibals. Their efforts, of course, are in vain, and they succeed only in massacring most of the cannibals. The party returns to the beach and waits for a week in hopes that D'Arnot will return (Jane is hoping that Tarzan will return), but the delay brings only more bad news: the treasure found by Porter and taken from him by the mutineers can no longer be located where the latter buried it. After the week has passed, the group finally gives D'Arnot up for dead and leaves Africa.
 
 
 12
 Tarzan is heartbroken that Jane has left, but resolves to follow her. D'Arnot teaches him to speak French and prepares him for civilization, and together the two make their way to France. During the journey, Tarzan and D'Arnot become close friends. Tarzan tells D'Arnot that he removed Porter's treasure, hidden by the mutineers, to the jungle, and the two return briefly to recover it. Tarzan also shows D'Arnot the diary that his unknown father, Lord Greystoke, kept until his death. As it is written in French, Tarzan has been unable to read it, but when D'Arnot reads it he immediately realizes Tarzan's true identity. Tarzan is skeptical, but the diary contains a set of the fingerprints of Lord Greystoke's baby at the age of six months. When they reach Paris, D'Arnot asks a friend in the police department to compare these with Tarzan's current fingerprints. Before the results are available, however, Tarzan, whom D'Arnot by this time has shaped into an immaculate young French gentleman, continues to America, where he rescues Jane from a forest fire and presents to Porter a letter of credit representing the value of the recovered treasure. He also discovers that Jane has promised to marry a third suitor, Robert Canler, but Tarzan convinces Canler to release her. Upon her release, however, Jane agrees to marry Clayton and rejects Tarzan's proposal. Tarzan unhappily accepts this decision, bowing to her belief that it would be improper to breach her promise to Clayton. As the Book ends, Tarzan receives a cablegram from D'Arnot in Paris confirming that Tarzan is the true Lord Greystoke. He realizes, however, that if he reclaims his title and estates from Clayton, he takes them away from Jane as well. He therefore suppresses the information as to his true parentage.
 
 
 13
 B. The Exploitation of "Tarzan"; the 1931 Agreement
 
 
 14
 Tarzan of the Apes proved to be quite popular. In 1914, it was republished in book form, and thereafter it was translated into several foreign languages. Burroughs continued to write books about Tarzan and his adventures, and these, too, were very popular. In 1923, Burroughs established plaintiff ERB, Inc., to own, license, and control the rights in his works. The stock was held by Burroughs, his wife, and a trust for their children. In a Memorandum of Agreement dated April 2, 1923, he transferred to ERB, Inc., his retained rights in all of his literary works, including the Tarzan books. As further Tarzan books were written, the rights in these were also transferred to the corporation.
 
 
 15
 In 1931, ERB, Inc., granted certain rights to Metro-Goldwyn-Mayer Corporation, the predecessor of defendant Metro-Goldwyn-Mayer, Inc. (both referred to as "MGM"). Paragraph 1 of the 1931 Agreement gave MGM
 
 
 16
 the right to create and write an original story, using as one of the characters therein, the character of "TARZAN", which character was originally created by (Burroughs), and including also, at the discretion of (MGM), all or any of the other characters used in all or any of the stories heretofore written by (Burroughs).
 
 
 17
 Paragraph 1 also allowed MGM to use, for its original story, any title consisting of more than one word, other than a title used by Burroughs in the works listed in the exhibit to the Agreement. Exhibit A listed fourteen works, including Tarzan of the Apes, The Son of Tarzan, Tarzan, Lord of the Jungle, Tarzan, Guard of the Jungle, The Tarzan Twins, and Tarzan and the Ant Men. The 1931 Agreement allowed MGM to make a film, or "photoplay," based on the original story written pursuant to P 1, and to make subsequent films based substantially on the same story as the first film and using the same title as the first film. Paragraph 14 provided as follows:
 
 
 18
 (MGM) shall have the right to make a photoplay based on said story; and, after the production of the first photoplay based on said story, shall thereafter have the right to reissue said first photoplay, and likewise to remake said first photoplay and also to produce additional photoplays based on said story. (MGM) agrees, however, that all "remakes" of the first photoplay produced by it hereunder, as well as based substantially upon the same story as that used by (MGM) in connection with said first photoplay and that in such subsequent remakes and/or additional photoplays there will be no material changes or material departures from the story used in connection with said first photoplay. (MGM) further agrees that all remakes and that all further photoplays produced by it subsequent to the production of said first photoplay hereunder, shall bear the same title as that used for said first photoplay.
 
 
 19
 In return for these rights, MGM paid a fixed sum of $20,000. ERB, Inc., was to receive no portion of the receipts of the original film or of any remake, and there was no provision for continuing royalties.
 
 
 20
 As contemplated by the 1931 Agreement, MGM created and wrote a story using the Tarzan character. A copy of the script was given to Burroughs for his review, and he pointed out what he viewed as similarities between the script and the Book.[3] He noted, for example, a similarity between the names "Archimedes Q. Porter," father of "Jane Porter" in the Book, and "James Porter," father of "Jane Porter" in the script. MGM therefore changed the names in the script to "James Parker" and "Jane Parker." In 1932 MGM released the finished film, starring Maureen O'Sullivan as Jane and Johnny Weissmuller as Tarzan, under the title Tarzan, the Ape Man.
 
 C. The 1932 Film
 
 21
 In the 1932 film, Tarzan, the Ape Man, James Parker and his "partner," Harry Holt, are in Africa running an inland trading post and planning a safari to locate the fabled elephants' graveyard, where they expect to find a fortune in ivory. Parker appears to be a marginally successful English businessman, well able to survive in Africa but not happy to be there. Holt appears to be a young British adventurer joining in the safari for the opportunity to make enough money to leave Africa. Parker's daughter Jane comes from England to join them, eager for adventure and happy to be in Africa. Both Parker and Holt tell Jane she cannot join the expedition; but as she proves that she is a skillful marksman, they consent to her participation. It seems that she is accustomed to getting her own way with her father, and that Holt has instantly fallen in love with her.
 
 
 22
 The party, with many native bearers, sets out on the safari and encounters various hazards on the trip. For example, they find and cross the "Mutia Escarpment," a tall, steep cliff beyond which is Tarzan's territory, and they cross a great river filled with unfriendly hippopotamuses and crocodiles. Except for a few native bearers, the party survives these hazards, primarily through their own efforts but with some help from Tarzan. (All of the bearers have been killed by the end of the film.) Despite this initial aid, Tarzan is not appreciated as an ally. He is feared by the entire party, and they take every opportunity to shoot at him.
 
 
 23
 Soon after the river crossing, Tarzan kidnaps Jane and takes her to his tree-top shelter. She is frightened by him, and even more frightened by his ape companions, but is forced to spend the night in the shelter while he sleeps on a platform outside to protect her, his knife conspicuously in his hand. She tries to speak with him, but although he mimics her words they can communicate nothing beyond their names except through sign language. In the morning, while he is out gathering food, the safari chances to pass under the tree where Jane is waiting. She readily rejoins her party, convinced that Tarzan is a man but not yet in love with him. As Tarzan returns, Holt shoots and kills one of Tarzan's ape friends, and takes a shot at Tarzan as well.
 
 
 24
 At this point Tarzan ceases to be the protector of the safari. Quite the contrary, he begins killing native bearers who have become separated from the party. This, of course, reinforces the desire of Parker and Holt to kill Tarzan, although Jane argues that she can convince him to desist. She soon gets her chance, for Tarzan, with the help of an ape, again kidnaps her. Holt succeeds in wounding Tarzan during the incident, and in his weakened condition Tarzan barely survives an attack by two lions. An elephant carries him to safety in the jungle, where the apes bring Jane to him, and she tends his wounds, tearing strips of material from her dress to use as bandages. While Tarzan is recovering they go swimming together, and Jane marvels at his beauty and fantasizes aloud, confident in the knowledge that he cannot understand her.[4]
 
 
 25
 Jane has now fallen in love with Tarzan, but she still causes him to return her to what remains of the safari when it again chances to pass beneath the tree where she and Tarzan are enjoying a dinner of fresh fruit. Parker is pleased to be reunited with her, but Holt again tries to shoot Tarzan until Jane intercedes. No sooner does Tarzan leave the vicinity than the entire group is captured by a tribe of pygmies. The pygmies take their prisoners by canoe to their village, where it soon becomes clear that the latter are to be sacrificed to a giant gorilla. Jane appears to be the particular object of the ceremony. Fortunately, however, their abduction has been witnessed by Cheetah, one of Tarzan's monkey friends, who takes word to Tarzan. Tarzan comes to the rescue with the aid of a herd of elephants just as the three Europeans, now the sole survivors of the safari, are on the verge of being killed.
 
 
 26
 In the end a dying elephant, wounded during the rescue, carries Parker to the elephants' graveyard, where Parker dies, happy to have reached his goal. Holt rides off toward civilization alone. Jane stays in the jungle, happy to be with Tarzan.
 
 D. MGM's 1959 Remake of the 1932 Film
 
 27
 Burroughs died in 1950. As his wife had predeceased him, control of ERB, Inc., passed to his children.
 
 
 28
 In 1959, MGM remade Tarzan, the Ape Man. As P 14 of the 1931 Agreement required, the name remained unchanged. But the film was updated and modernized, and ERB, Inc., eager to assert its full rights under the 1931 Agreement, brought suit in California Superior Court for breach of contract, charging that the 1959 film "was not 'based substantially upon the same story' as the (1932 film), and that it contained 'material changes' and 'material departures.' " Edgar Rice Burroughs, Inc. v. Metro-Goldwyn-Mayer, Inc., 205 Cal.App.2d 441, 443, 23 Cal.Rptr. 14, 15 (1962). The court viewed the two films and concluded, as a matter of law, that they were substantially similar within the meaning of P 14. Id. at 444, 23 Cal.Rptr. at 15-16. The decision was affirmed by the District Court of Appeal, which held that "the right to update, modernize and adapt the story to life in today's generation and employ current methods and techniques" was inherent in the remake right. Id. at 447, 23 Cal.Rptr. at 18. It held that "changes are not material or substantial in nature as long as the locus of the play, the order of sequence, the development of the plot, and the theme, thought and main action of the story are preserved." Id. at 448, 23 Cal.Rptr. at 18.
 
 
 29
 E. The 1976 Copyrights Act and the Notice of Termination
 
 
 30
 In 1976, Congress enacted the new copyright Act, which was to become generally effective on January 1, 1978.[5] Section 101, § 304(c) of the Act, under certain conditions, allows a living author or specified heirs of a dead author to terminate a copyright grant fifty-six years after the copyright was originally secured, thus permitting the author or his family to enjoy the nineteen-year extended renewal term provided by the Act.[6]
 
 
 31
 On December 12, 1977, more than two weeks before the effective date of the Act, Burroughs's heirs attempted to exercise their termination rights under § 304(c). The "advance notice" of termination was signed by John Coleman Burroughs (since deceased) and plaintiff Hulbert Burroughs, two of Burroughs's three children, and was delivered to ERB, Inc., on December 16, 1977. It purported to terminate, effective December 16, 1979, the transfer of copyrights from Burroughs to ERB, Inc., pursuant to the Memorandum of Agreement dated April 2, 1923. The notice was recorded in the United States Copyright Office on March 6, 1978, but was not served on MGM or any other person. It specified that the termination covered thirty-five of Burroughs's works, including Tarzan of the Apes; but it did not mention five of the Tarzan books, to wit, The Son of Tarzan, Tarzan, Lord of the Jungle, Tarzan, Guard of the Jungle, The Tarzan Twins, and Tarzan and the Ant Men.
 
 
 32
 F. MGM's Plans for a New Remake; the Commencement of the Present Litigation
 
 
 33
 In January 1980, MGM announced plans to do a second remake of Tarzan, the Ape Man, to be directed by John Derek and to star Bo Derek as Jane. Plaintiffs (ERB, Inc., had by this time received a regrant from the heirs) objected, claiming that MGM's rights under P 14 of the 1931 Agreement had been "rendered null and void" in December 1979 by virtue of the fact that ERB, Inc., the party with which MGM had contracted, had lost the underlying copyright interests. MGM disputed plaintiffs' position, arguing that (1) its rights under the 1931 Agreement were not subject to termination since the 1932 film was based not on any of Burroughs's copyrighted works, but on an original story by MGM, and (2) in any event, there could be no termination of its rights until two years after MGM itself had received notice in compliance with § 304.
 
 
 34
 Plaintiffs commenced the present suit seeking to enjoin, preliminarily and permanently, the production of the new film on the ground that it would infringe plaintiffs' copyrights, and demanding money damages. The district court, in an opinion reported at 491 F.Supp. 1320 (1980), familiarity with which is assumed, denied a preliminary injunction, holding that plaintiffs had shown no reasonable likelihood that they would prevail on the merits nor any likelihood of irreparable injury, and that they had not demonstrated that the balance of hardships tipped decidedly in their favor. In assessing the merits, the court found (1) that the 1931 Agreement granted a character license by which the parties did not intend the conveyance of any copyright interest, and thus the 1931 Agreement was not subject to termination under the Act; and (2) that even if a copyright interest had been conveyed it had not been terminated because (a) the purported termination was a nullity, since it was served on ERB, Inc., before the effective date of the Act; (b) the failure to serve MGM made the notice ineffective with respect to MGM; and (c) the notice failed to comply with the regulations promulgated under § 304(c)(4)(B) by the Register of Copyrights, since in omitting MGM it did not list each grantee whose rights were being terminated, 37 C.F.R. § 201.10(b)(1)(i), and in omitting five titles supposedly covered by the notice it did not reasonably identify the grant to which the notice applied, 37 C.F.R. § 201.10(b)(1)(iii).[7] We affirmed the denial of the preliminary injunction by order, 636 F.2d 1200 (2d Cir. 1980), without intimating any views on the merits, but relying solely on the district court's assessment that the equities in the case weighed against issuance of a preliminary injunction.
 
 G. The 1981 Film
 
 35
 While the litigation continued, MGM proceeded with its production of the 1981 version of Tarzan, the Ape Man for release in July 1981. In the 1981 film Jane Parker travels from England to join her father, James Parker, somewhere in the interior of Africa. It is a difficult and dangerous journey: at one point she is attacked by the lecherous crew of a riverboat, and in defending herself shoots one of the men. When she reaches Parker's camp, she meets Harry Holt, a photographer, who seems instantly smitten with her. Parker, a blustering, conceited, obsessed adventurer, is preparing an expedition to discover the fabled elephants' graveyard beyond the "Mutia Escarpment." Over Parker's objections, Jane joins the expedition.
 
 
 36
 The party, which consists of the Parkers, Holt, Parker's mistress, and many native bearers, sets off and after about a week reaches the escarpment, a huge rock wall jutting straight up into the sky, its top obscured by clouds. They hear the cry of Tarzan, who is generally thought by natives of the area to be a giant white ape, and most of the bearers are frightened into turning back; but the remainder of the party continues, reaching the top of the escarpment after difficult climbing. At the top they face treacherous travel through dense jungle, but after several more days of hard work they reach the "inland sea." Here Jane stops to bathe, promising to catch up with the rest of the party, but as she leaves the water she is threatened by a lion. Tarzan rescues her, subduing the lion without violence. Jane, although frightened of Tarzan, is grateful and realizes he is a man; but when Parker and Holt return to the scene they begin shooting at Tarzan, who flees into the jungle. Parker resolves to kill Tarzan and bring him back to his club as a trophy.
 
 
 37
 The expedition continues its search, but during the march Parker's mistress is captured by a tribe of painted blacks, later discovered to be "ivory men" who live in the elephants' graveyard and appear to worship ivory. Parker blames the disappearance of his mistress on Tarzan and redoubles his efforts to kill Tarzan.
 
 
 38
 Soon Tarzan reappears, kidnaps Jane, and takes her into the jungle. She attempts to speak to him, but he does not understand her. She attempts to escape, but when she begins moving through the jungle alone she is attacked by a large python. Tarzan rescues her, but is injured in the process. An elephant carries him to safety in the jungle, where Jane nurses him, tearing a strip from her dress to sponge his wound. Although still frightened by him, she spends the night on his platform in a tree, and he does not harm her. The next morning they swim together and eat fresh fruit. They are curious about each other, and Jane fantasizes aloud, confident in the knowledge that he cannot understand her.
 
 
 39
 Jane now seems to have fallen in love with Tarzan, but nevertheless causes him to return her to Parker when she hears him searching for her. Parker is pleased to be reunited with her, but both he and Holt try to shoot Tarzan until Jane stops them. No sooner does Tarzan leave the vicinity, however, than the entire group is captured by the ivory men, who take their prisoners by canoe to their village in the midst of the elephants' graveyard, where it appears that Parker and Holt are to be killed and Jane is to be sacrificed to the giant Ivory King. Fortunately, however, their abduction has been witnessed by Cheetah, one of Tarzan's monkey friends, who takes word to Tarzan. Tarzan comes to the rescue just as the Ivory King appears to be on the verge of ravishing (or perhaps ravaging) Jane. Parker dies, happy to have discovered the elephants' graveyard. Holt promises to return to civilization to tell the story. Jane stays in the jungle, happy to be with Tarzan.
 
 
 40
 H. The District Court's Decision on the Merits
 
 
 41
 In February 1981, the plaintiffs moved for partial summary judgment declaring the 1931 Agreement subject to termination under § 304(c). In March, the defendants moved for partial summary judgment declaring the purported termination pursuant to § 304(c) ineffective. While these motions were sub judice the 1981 film was completed, and plaintiffs sought an injunction forbidding its release prior to the court's decision on the merits. Plaintiffs also amended their complaint to allege that the 1981 film violated the terms of the 1931 Agreement, in that it was not "based substantially upon the same story as that used by (MGM) in connection with" the 1932 film, and that there were "material changes or material departures from the story used in connection with" the 1932 film.[8]
 
 
 42
 On July 10, 1981, in an opinion reported at 519 F.Supp. 388, the court granted summary judgment in favor of MGM. Changing its earlier view that the 1931 Agreement was not intended to grant MGM a copyright interest, see 491 F.Supp. at 1324, the court held that the character "Tarzan" was sufficiently unique to be copyrightable and that the grant of a license to use the character "Tarzan" was a copyright interest subject to termination under § 304, 519 F.Supp. at 390-91. Nevertheless, the court adhered to its earlier view, 491 F.Supp. at 1424-26, that the purported termination had been ineffective under § 304 because it was served prematurely, was not communicated to MGM, and did not mention five of Burroughs's books from which MGM was entitled to use characters. The court therefore rejected plaintiffs' claim that the 1981 film breached the 1931 Agreement because it was not based substantially on the same story as the 1932 film, the court, with the agreement of the parties, viewed both films. After the screenings, the court apparently suggested that MGM make certain changes in the 1981 film,[9] and, once the changes were made, held that the film complied with the 1931 Agreement. 519 F.Supp. at 392-94.
 
 
 43
 Accordingly, the court denied plaintiffs' motions for injunctive relief and dismissed the complaint. Motions by plaintiffs for a stay, both in the district court and this court, were denied, and the film was released on July 24, 1981. These appeals followed.
 
 
 44
 The principal issues are whether the heirs' 1977 notice was effective under the Act to terminate the rights of MGM, and whether the 1981 film exceeded MGM's rights under the 1931 Agreement.
 
 II. THE COPYRIGHT CLAIM
 
 45
 Plaintiffs assert two alternative, although apparently not unrelated, grounds for their copyright claim. First they contend that "(t)he literary character TARZAN ... is clearly the subject of copyright protection," (Appellants' Reply Brief at 5), that the 1931 Agreement granted MGM a copyright license "to incorporate TARZAN and other Burroughs' (sic) characters into a motion picture," (Appellants' Brief at 1), and that that character license was terminated in 1977, effective in 1979. Alternatively, plaintiffs contend that even if MGM's character license under the 1931 Agreement was not terminated, MGM's 1932 film, whose story was required to be the basis for the 1981 film, was based on the Book, Tarzan of the Apes, and that the 1981 film therefore infringes the Book.[10] Like the district court, we find neither contention persuasive. As to the claimed termination of the character license, however, we base our conclusion on only one of the several grounds discussed by the district court.
 
 
 46
 A. The Claimed Termination of the Character License
 
 
 47
 Plaintiffs' contention that, pursuant to § 304(c), the heirs terminated whatever character license MGM had under the 1931 Agreement, raises a number of interesting, and perhaps difficult, technical questions regarding old and new copyright issues. First is the venerable question as to whether and in what circumstances an author's creation of a fictional character can be protected by copyright. See Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930) (L. Hand, J.), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). If copyright protection was available and a copyright interest was conveyed, there is a series of questions as to the adequacy of the heirs' notice of termination: whether it was timely, whether it was served on the required persons, and whether its content was sufficient to extinguish MGM's right to use the Tarzan character. In order for the plaintiffs to prevail on this version of their copyright claim, each of these questions must be answered in their favor. Since we conclude that the district court correctly ruled that the issue of the sufficiency of the content of the notice must be decided adversely to the plaintiffs, we turn directly to that point and express no view as to the others.[11]
 
 
 48
 As described in Part I.B. above, P 1 of the 1931 Agreement gave MGM the right to use, in an original story, the character "Tarzan" and any or all of the characters used in any of the stories theretofore written by Burroughs. Fourteen such stories were listed in an exhibit to the Agreement, including five that are of particular importance to this case: The Son of Tarzan, Tarzan, Lord of the Jungle, Tarzan, Guard of the Jungle, The Tarzan Twins, and Tarzan and the Ant Men. These five books are significant because they recount adventures of Tarzan and were not mentioned in the notice sent by Burroughs's heirs to ERB, Inc., informing it of the termination of its copyright interests in Burroughs's works.
 
 
 49
 To be effective, a notice of termination under § 304(c) must clearly identify "the grant to which the notice of termination applies," 37 C.F.R. § 201.10(b) (1)(iii), and must list the title, author, and date of original copyright for "each work to which the notice of termination applies," 37 C.F.R. § 201.10(b) (1)(ii). While we do not suggest that the omission of the five titles affected the efficacy of the notice to terminate the interest of ERB, Inc., in such titles as were listed, see 3 Nimmer on Copyright P 11.06(B), at 11-40 n.33 (1981), it did leave ERB, Inc.'s interest in those five books, all of which feature "Tarzan," intact.
 
 
 50
 Plaintiffs argue that ERB, Inc.'s surviving interest in these five titles ("the Surviving Five") is irrelevant to the present lawsuit because if Tarzan as a literary character is protectable by copyright, he was copyrightable only in his initial appearance, for only in that appearance was he original. Thus they contend that to the extent MGM was given a copyright license to use the character Tarzan, that license was revoked when the heirs gave ERB, Inc., notice of termination of the Book, Tarzan of the Apes, since it was in the Book that Tarzan made his first appearance and only there that he was copyrightable.[12] If we assume with plaintiffs that Tarzan as a character would have been copyrightable in his first appearance and not thereafter, we must nevertheless disagree with them as to the sufficiency of their notice of termination. When an author grants the rights to a work that contains material protected by the author's copyright in an earlier work, the grant implicitly authorizes the use of all material contained in the licensed work, including material that may be covered by the author's other copyrights. Thus, had Burroughs in his 1923 contract with ERB, Inc., listed only the Surviving Five titles, his conveyance of the rights to those titles would implicitly have authorized ERB, Inc., to use and exploit all material in those titles, including the character Tarzan which was central to each of those books. The heirs' notice of termination did not mention the Surviving Five, and stated merely that the grant of renewal copyrights in the other works listed was thereby terminated. Since the heirs' omission of the five works, while undoubtedly inadvertent, must be characterized as voluntary, we do not see the rights with which ERB, Inc., was thereby left in these five books as differing from the rights ERB, Inc., would have had if the 1923 grant from Burroughs to ERB, Inc., had listed only the Surviving Five. We conclude, therefore, that the heirs' incomplete notice left ERB, Inc., with license to use and exploit the character Tarzan.
 
 
 51
 In sum, as the 1931 Agreement was written, ERB, Inc., gave MGM, by hypothesis, a license to use the character Tarzan and any of the other characters from fourteen of Burroughs's books. After the heirs' notice of termination, ERB, Inc., still had authority to license the character Tarzan by virtue of its rights in the Surviving Five, and MGM therefore still had the right to reuse Tarzan and whatever other characters it had used in the 1932 film if they appeared in any of the Surviving Five.
 
 B. The Claimed Infringement of the Book
 
 52
 Plaintiffs' alternative argument appears to be that MGM has infringed their copyright interests even if the character license has survived by virtue of the five omitted titles, because the character license cannot support use by MGM of noncharacter material covered by Burroughs's copyrights. In aid of this alternative, they contend that MGM did not simply use the Tarzan character, but in fact based the 1932 film on the Book, Tarzan of the Apes. In so arguing plaintiffs seek to show that, if the 1981 film is a faithful remake of the 1932 film, it too is based on the Book, and that since the notice of termination was adequate as to the Book, the 1981 film infringes the Book.[13] Assuming, arguendo, that the notice of termination was effective as to Tarzan of the Apes, plaintiffs' argument nevertheless fails because its basic premise, i.e., that the 1932 film is based on the Book, is erroneous.
 
 
 53
 In evaluating this claim we have, as plaintiffs have urged, compared the 1932 film to the Book. Our comparison has differed somewhat from that in the typical copyright infringement case, in that we have made allowance for the license given MGM to copy the Tarzan character common to all the books. Otherwise we have followed the long-familiar techniques of such cases as Nichols v. Universal Pictures Corp., supra, 45 F.2d 119, and Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49 (2d Cir.) (L. Hand, J.), cert. denied, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936), and examined the works in detail to determine if they are substantially similar. We recently summarized the most relevant principles in Warner Bros., Inc. v. A. B. C., 654 F.2d 204 (2 Cir. 1981):
 
 
 54
 (I)t is well settled that copying may be inferred where a plaintiff establishes that the defendant had access to the copyrighted work and that the two works are substantially similar....
 
 
 55
 "(T)he determination of the extent of similarity which will constitute a substantial and hence infringing similarity presents one of the most difficult questions in copyright law, and one which is the least susceptible of helpful generalizations." 3 Nimmer on Copyright § 13.03(A), at 13-16 (rev. ed. 1980) (emphasis in original).... In the case of literary works, it is axiomatic that copyright protection only extends to the expression of the author's idea, not to the idea itself. (citations) Thus, in determining whether two such works are so substantially similar as to reveal an infringement of one by the other, courts must decide whether the similarities shared by the works are something more than mere generalized ideas or themes. Attempting to afford some guidance on this perplexing issue, Judge Learned Hand set forth what later became known as his "abstractions test" in Nichols (supra):
 
 
 56
 ... Upon any work ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out.... (T)here is a point in this series of abstractions where they are no longer protected ....
 
 
 57
 45 F.2d at 121 (citations omitted). Quite accurately, Judge Hand noted that "(n)obody has ever been able to fix that boundary, and nobody ever can." Id.
 
 
 58
 654 F.2d at 207-08 (footnotes omitted). Based on our comparison, and discounting permitted similarities in characterization, we conclude as a matter of law that the 1932 film was not based on the Book, for no reasonable jury could find the two works substantially similar beyond the level of generalized ideas or themes.
 
 
 59
 If we take one of the most general patterns in Judge Hand's series of abstractions, of course, there is a clear similarity between the Book and the 1932 film. Both tell the story of Tarzan, an ape-man living in the jungle, and Jane, a beautiful woman from civilized society, who meet in the jungle and fall in love. When we move to a more specific level of abstraction, however, the differences in the story overwhelm this general similarity. The Book is essentially Tarzan's story, recounting his heritage, his upbringing and his search for his identity; the meeting with Jane, which occurs nearly mid-way through the Book, is only a part of Tarzan's story.[14] The film, on the other hand, is primarily Jane's story expressing her fantasies and concerns, but telling little of Tarzan's history and nothing of his actual parentage. There are many other differences as well. In the Book, Jane is marooned on the beach, hoping from the start to be able to return to America; in the film, Jane insists on joining the expedition into an all but inaccessible jungle. In the Book, Tarzan is always on the best of terms with Jane's party, protecting its members from mortal danger at every turn; in the film, Tarzan kills three members of the safari, and another member wounds him in one of several attempts to kill him. In the Book, Jane leaves the jungle, apparently to marry another; in the film, she stays with Tarzan.
 
 
 60
 The plaintiffs recognize that the overall stories are different. A memorandum relied on by plaintiffs, prepared by one of them in 1980, summarized the two plots as follows:
 
 
 61
 (Book): After searching for and finding buried Spanish treasure, the Porter expedition is set upon by their mutinous crew and placed ashore on the west coast of Africa in the vicinity of TARZAN's lair.
 
 
 62
 (1932 film): The Parker party sets out for the land beyond the forbidden "Mutia" escarpment in search of treasure in the form of ivory to be found at the sight of the fabled "Elephants Graveyard" near which is found TARZAN's lair.
 
 
 63
 (March 17, 1980, Memorandum of plaintiff James Michael Pierce ("Pierce Memorandum") at 11.) They seek to overcome these differences by pointing to certain specific similarities, some that Burroughs himself pointed out in 1931, see note 3, supra, and accompanying text, and some that plaintiffs have come up with on their own. We have examined their claims and conclude that the few purported similarities either are so general as to be meaningless, or are not similarities at all.
 
 
 64
 In 1931, after Burroughs reviewed the film's script in order to advise MGM of the similarities he found, he described the film as "a new version of TARZAN OF THE APES"; our review, however, suggests that the emphasis should be on "new." Burroughs claimed only four specific similarities. The first was the similarity in the names, described in Part I.B., supra, and although these were arguably within the terms of the character license, MGM nevertheless decided to use different names. Second, Burroughs noted that the Book's Tarzan saw white people, and a white woman, for the first time in Porter's party and Jane, and asserted that the film's Tarzan "apparently sees white people for the first time and a white woman for the first time" in Parker's safari and Jane. Even if this were a specific enough similarity to constitute an infringement, which seems doubtful, it is not clear that there is, in fact, a similarity. The film is very mysterious about Tarzan's origins. The only reason to believe he had not seen whites before is the unlikelihood of anyone having crossed the "Mutia Escarpment," but that possibility obviously existed (as Parker's expedition proved). Furthermore there is no suggestion that Tarzan had always been on the far side of the escarpment. He could not have been born there, for example, unless whites had previously crossed it. Burroughs's third similarity was Tarzan's inability to speak or understand English in both Book and film. Although this is a similarity, its significance is minimized by the overwhelming differences between Book and film: in the Book, Tarzan can read and write English, and he puts these abilities to good use. His first contact with the Porter party is a note he posts on the door; he reads a letter Jane has written to a friend, and adds a note identifying himself; he communicates with D'Arnot through notes written on tree bark; he even leaves Jane a note declaring his love for her. In the film, on the other hand, he is virtually unable to communicate with humans save by sign language. The sole exception in the film is his ability to communicate his name-information that, significantly, he does not communicate effectively in the Book.
 
 
 65
 Finally, Burroughs claimed that there was also a close similarity between the killing of Kala, Tarzan's foster mother, followed by Tarzan's grief in the Book, and the killing of the she-ape followed by Tarzan's grief in the 1932 film. Again, though, the overall circumstances are quite different. In the Book, Kala is "huge," a "large and powerful" anthropoid ape, "a huge, fierce, terrible beast." 24 All Story at 256. Although she is not described precisely, others of her species "tower(ed) over six feet in height," id. at 259, and "weigh(ed) perhaps three hundred and fifty pounds," id. at 255. She is killed with a poison arrow by Kulonga, a native searching for food. The young Tarzan does not witness the death, but arrives at the scene to see Kala's dead body and suffers all the anguish associated with the sudden, violent death of one's mother:
 
 
 66
 Tarzan's grief and anger were unbounded. He roared out his hideous challenge time and again. He beat upon his chest with his fists, and then he fell upon the body of Kala and sobbed out the pitiful sorrowing of his lonely heart.
 
 
 67
 Id. at 277. After this first outburst, Tarzan regains control. He then stalks Kulonga through the jungle and kills him savagely. In the film, in contrast, the ape that is shot is an unidentified ape; she is supposedly of Tarzan's tribe but is certainly not his foster mother. She is not even one of the great anthropoids of the type Burroughs vividly describes, but a smaller creature which appears to be shorter, and lighter in weight, than Tarzan. In the film, this ape is killed not by a native but by Holt; she is shot not with a poisoned arrow but with a rifle; and she is shot not for food, but because of a mistaken belief that she is threatening Jane. The adult Tarzan witnesses the death. He is upset by it,[15] but does not seek vengeance against Holt. (Indeed, Holt seems to be the only member of the safari to leave the area alive.[16]) Furthermore, the dramatic purpose of the two deaths is fundamentally different. In the Book, Kala's death eliminates the bond that ties Tarzan to his tribe. After she dies, he feels free to leave. Her death thus facilitates the transmutation of Tarzan from jungle beast to civilized man. It is Kala's death that leaves Tarzan in a position to aid and protect the Porter party. The death of the ape in the film, on the other hand, reveals the safari's animosity toward Tarzan, and may produce his animosity in return. Far from freeing Tarzan from the jungle and leading to his recivilization, the film ape's death ties him more closely to the jungle.
 
 
 68
 Perhaps recognizing that the supposed similarities listed in Burroughs's 1931 letter would be inadequate, the plaintiffs have searched the two works for further similarities in locale, incidents, and characters to present to the court. As for locale, it is true that both works are set in sub-Sahara Africa, but that is too general an abstraction to advance their cause. A more specific comparison reveals that the settings are about as different as possible, consistent with Tarzan's characterization as a creature of the African jungle. The Book is set principally on the west coast of Africa in present-day Angola. (The Book begins in England, in present-day Sierra Leone, and at sea on the Atlantic Ocean; it ends in France and America.) Most of the action takes place on the beach, in sight of the Atlantic Ocean, or in the jungle less than a day's easy travel inland. The area of Tarzan's tribe is bounded by the ocean on the west, and isolated from the rest of Africa by high hills on the remaining three sides. It is "watered by no great river," 24 All Story at 275, and there is no ivory to be gathered in the area, id. at 276. In the film, by contrast, Parker's trading post is inland, set on a river beyond the reach of ocean-going vessels. The location is inhabited and in regular contact with the outside world. Tarzan is found even farther inland, beyond the nearly impassable Mutia Escarpment. The region is watered by a large river (introduced by MGM to serve as one of the safari's hazards), and contains a fortune in ivory in the elephants' graveyard (introduced by MGM to serve as the safari's goal).
 
 
 69
 Plaintiffs' claims of similar incidents are no more persuasive. They claim, for example, that Tarzan kills a lion with a strangle hold in both Book and film. An examination of the record, however, reveals that the animal strangled in the Book is a tiger, see note 1 supra, and in the film is a lion. Furthermore, the circumstances are entirely different. In the Book the tiger is attacking Jane through the window of Tarzan's cabin on the beach. Tarzan, assisted by Clayton, gets the tiger by the tail, pulls it from the cabin, and kills it with a full nelson. In the film, however, Holt (Clayton's alleged cinematic counterpart) shoots and wounds Tarzan, and Tarzan retreats into the jungle. There, in his weakened state, he is attacked by two lions. He is barely able to prevail, weakening one with a strangle hold, and eventually killing both with his knife. These two incidents are similar only at a level of abstraction far beyond that which copyright will protect.
 
 
 70
 Plaintiffs' view that there is a similarity in Jane's use of a firearm in both works is similarly belied by the circumstances. In the Book, Clayton asks Jane, "You can use a revolver, can't you?" 24 All Story at 298. He expects danger at any moment, and clearly hopes for an affirmative response. When she says yes, he gives her a revolver that he has managed to purloin from one of the mutinous crewmen. She does not use it for several hours, and then only out of necessity. Despite her claimed ability, she can do no better than to hit the shoulder of an immobile tiger at a range of ten feet, having aimed, of course, for its head. She faints before taking a second shot. When she regains consciousness, she makes no attempt to use the revolver on the tiger that is now on the verge of attacking her. Her only thought is to use it on Esmeralda and herself to ensure a speedy death, rather than face the tiger. In the film, when Holt asks Jane, "Can you shoot?", the expedition has yet to begin and Holt is trying to dissuade Jane from joining it. He clearly expects and hopes for a negative response. Jane, however, takes a rifle and gives a demonstration that would have done Annie Oakley proud. This clinches her argument that she should be allowed to join the safari. Thus, the two incidents are similar only in that Jane shoots a gun, a level of abstraction that is beyond the protection of copyright.
 
 
 71
 Plaintiffs' last supposedly similar incident is Tarzan's being nursed back to health, in both Book and film, by apes. The limited similarity, however, is merely that Tarzan is nursed back to health. In the Book, the ten-year-old Tarzan is seriously injured (chest laid bare to the ribs, three of which were broken, one arm nearly severed, neck laid open exposing the jugular vein, and left unconscious) in a fight with a gorilla (which Tarzan has killed). Kala alone spends what seems to Tarzan an eternity nursing him back to health. In the film, on the other hand, the adult Tarzan is wounded by a rifle shot, suffering only slight injuries. (The injuries are not severe enough to prevent Tarzan from killing two lions as he retreats into the jungle, although they do leave him dizzy.) An elephant carries the injured Tarzan to safety in the jungle, where all the apes try to assist him, but it is Jane who quickly nurses him back to health, wrapping his head in a bandage which he shortly removes to go swimming with her.
 
 
 72
 Plaintiffs make the additional claim that there are similarities in characters. (Pierce Memorandum at 3-10.) Most of the similarities claimed here are in the character of Tarzan, e.g., his strength and agility, his costume, and his jungle cry; but these obviously are within the scope of the character license. Plaintiffs also claim two character similarities that could arguably be characterized as incidents, so we will discuss them briefly. They claim that in the Book, "Clayton falls in love with Jane, but Jane's heart belongs to TARZAN," and that in the film, Holt falls in love with Jane, but she "prefers to remain with TARZAN." (Pierce Memorandum at 7.) In the event, however, there is no similarity, for the Book ends with Jane's agreeing to marry Clayton, while the film ends with exactly the opposite decision as to his alleged counterpart, Holt. Furthermore, even if the claimed similarity did exist, it would be too general to warrant copyright protection. The story of a woman choosing between two suitors is at least as old as literature.
 
 
 73
 Finally, plaintiffs argue there is a similarity between Tarzan's and Jane's first meeting in the Book, and their first meeting in the film. Naturally there are certain similarities required by Tarzan's character and the jungle setting, but on the whole the differences are sufficient to offset any similarities beyond that. In the Book, Tarzan meets Jane by rescuing her from Terkoz who has kidnaped her; in the film, Tarzan meets Jane when he himself kidnaps her. In the Book, Tarzan and Jane are alone after the rescue; in the film, Tarzan and Jane are chaperoned by the apes and monkeys who live with him. In the Book, Jane is not afraid of Tarzan, but trusts him completely; in the film, she is afraid of him, albeit more afraid of the apes. In the Book, Tarzan builds a makeshift shelter on the ground; in the film, he appears to have a permanent shelter in the trees. In the Book, Tarzan gives Jane his knife to assure her of her safety; in the film, he keeps his knife conspicuously in his hand. In the Book, Tarzan returns Jane to the cabin voluntarily, and she is disappointed to return for she has fallen in love with him; in the film, she voluntarily rejoins the safari in his absence, and is not yet in love with him. Once again, the differences are so great that the incidents relied on by plaintiffs cannot be considered "substantially similar" under the copyright law.
 
 
 74
 Having thoroughly reviewed all of the plaintiffs' claims, we must conclude that the 1932 film was not based on the Book, but was MGM's original story as contemplated by P 1 of the 1931 Agreement. Thus the heirs' termination of any right MGM may have had to use copyrighted material from the Book in its films, even if effective, is inapplicable here. The only right MGM claims is the right to use the Tarzan character. That right is fully supported by MGM's license based on the five titles as to which the heirs gave no notice of termination.
 
 III. THE CONTRACT CLAIM
 
 75
 We turn finally to the question whether the 1981 film complied with the requirements of the 1931 Agreement, i.e., whether the 1981 film was "based substantially upon the same story as that used by (MGM) in connection with (the 1932 film)," or whether instead it included "material changes or departures from the story in connection with (the 1932 film)." 1931 Agreement P 14. Although our technique here is similar to that used in resolving the claim that the 1932 film was based on the Book, in that we compare the works to determine similarities and differences, the standard is different. The standard here is established by the terms of the 1931 Agreement: Are the two films based on substantially the same story without material changes or departures?[17] We conclude that they are.
 
 
 76
 There can be no question that there are some differences between the 1932 film and the 1981 film. This is to be expected, for there would be no purpose in remaking a film if the new version were to be identical to the old. Indeed, the 1931 Agreement obviously contemplated that there would be differences of some sort in the remakes, since it prohibited only "material changes or departures" in the story. See Edgar Rice Burroughs, Inc. v. Metro-Goldwyn-Mayer, Inc., supra, 205 Cal.App.2d at 447, 23 Cal.Rptr. at 18 (holding the "right to update, modernize and adapt the story to life in today's generation" inherent under the 1931 Agreement). The only similarities that the 1931 Agreement required were with regard to the story.[18] It is thus on the story that we must focus, and we must recognize that the story is but one element of the film. One standard literary reference work, for example, defines "story," in its "broadest sense," to be "any account ... of actions in a time sequence; any narrative of events in a sequential arrangement; ... the collection of things that happen in the work." C. Hugh Holman, A Handbook to Literature 428 (4th ed. 1980). The story must be distinguished from the other elements of the film, such as characterization, setting, and effect, which are relevant, for our present purposes, only to the extent that they have an impact on the story.[19]
 
 
 77
 Reducing the 1932 film to a list of the major incidents, we find the story to be fairly simple: Jane, having come from England, joins Parker and Holt in Africa, and the three set out in search of the elephants' graveyard. They discover and cross the "Mutia Escarpment," a tall, steep cliff. They cross a wide river where they are threatened by hippopotamuses and crocodiles, but Tarzan protects them. Jane is kidnaped by Tarzan, and this is their first meeting; but she soon rejoins the safari. Holt shoots and kills one of Tarzan's ape friends, and takes a shot at Tarzan. Tarzan kills several native bearers. Tarzan kidnaps Jane again, but is wounded by Holt. During this second meeting, Jane nurses Tarzan, they go swimming, and Jane falls in love with him. Tarzan returns Jane to the safari. The entire safari is captured by pygmies, but Cheetah fetches Tarzan, who rescues the safari from a giant gorilla. Parker is taken to the elephants' graveyard and dies there, Holt rides off toward civilization, and Jane stays with Tarzan.
 
 
 78
 The 1981 film has essentially the same major incidents: Jane travels from England to join Parker and Holt in Africa, and the three set out to discover the elephants' graveyard. They travel for nearly a week, then reach and cross the "Mutia Escarpment," a tall, steep cliff. After difficult travel through dense jungle, they reach the "inland sea," where Jane is threatened by a lion. Tarzan rescues her-their first meeting-but Parker and Holt return to the scene and shoot at Tarzan. A member of the party disappears, and Tarzan is blamed. Tarzan kidnaps Jane. Protecting her, he is wounded by a python. During this second meeting, Jane nurses Tarzan, they go swimming, and Jane falls in love with him. Tarzan returns Jane to the expedition. The entire expedition is captured by "ivory men," but Cheetah fetches Tarzan who rescues the group from the giant Ivory King. Parker dies in the midst of the elephants' graveyard, Holt promises to return to civilization, and Jane stays with Tarzan.
 
 
 79
 As these brief summaries indicate, the two films are based on substantially the same story, and many of the incidents are virtually identical. The most significant difference between the stories is the 1981 film's elimination of the gratuitous violence found in the 1932 film. MGM argues that this is no more than an updating of the film to recognize present-day standards and values, and that its right to update and modernize was established by Edgar Rice Burroughs, Inc. v. Metro-Goldwyn-Mayer, Inc., supra, 205 Cal.App.2d 441, 23 Cal.Rptr. 14. This is probably true. More significant, though, is the fact that the story has not been substantially changed by the elimination of the violence. Although no blacks or hippopotamuses are killed in the 1981 film, the dangerousness of the region is established when the lion threatens Jane and the python attacks her. Although Holt does not kill an ape, the expedition's animosity toward Tarzan is established by Parker's repeated threats to kill him. Although Tarzan does not kill any native bearers, he is blamed for the disappearance of Parker's mistress, and the effect on the expedition is the same. Although Tarzan is not injured by Holt's shots, he is hurt by the snake, thus presenting Jane essentially the same opportunity to care for him. Although Tarzan does not kill two lions, he demonstrates his prowess at the same point in the story in the battle with the python. Although an elephant is not killed, Parker reaches the elephants' graveyard.
 
 
 80
 Plaintiffs challenge the substantial similarity of the two stories with claims that a number of differences are material. Some of these claims can be easily dismissed, for they relate to characterization differences that do not affect the story. The 1981 Parker, for example, is very different from the 1932 Parker. The character's place in the story, however, is the same in 1981 as it was in 1932. In both films, it is Parker to whom Jane comes in Africa, it is Parker who plans and leads the expedition to discover the elephants' graveyard, and it is Parker who ties Jane to civilization, dissuading her from joining Tarzan in the jungle during his lifetime. MGM was able to change the character without changing the story, and that is within the terms of the 1931 Agreement. Minor changes in Holt's character are covered by the same analysis. Although he is a photographer in the 1981 film, he remains Parker's assistant and Jane's would-be suitor. His place in the story is the same.
 
 
 81
 Plaintiffs' objections to the 1981 film's nudity (and the "R" rating that follows from it) may also be quickly dismissed, for the nudity does not alter the story, despite its effect on the overall impact of the film. Essentially two scenes are at issue: the inland sea scene (in which Tarzan first meets Jane) and the Ivory King scene (in which Jane is prepared for sacrifice). In the first scene, the story, both in 1932 and in 1981, calls for Tarzan to be curious about Jane and show an interest in her. If anything, the nudity contributes to the story, adding some degree of modern-day realism to an otherwise highly improbable scene. In the second scene, the story calls for Jane to be the center of attention. The 1932 film accomplishes this by having the other members of the safari defend Jane to the end, risking their own lives to protect her from the gorilla. She is the clear center of attention, not only for the gorilla but also for the screaming pygmies. The 1981 film makes Jane the center of attention with an elaborate preparation in which she is washed and painted by native women. The scene is far more effective when she is partially nude. Once again, the nudity does not alter the story but contributes to it.
 
 
 82
 Nor do we find persuasive the contention that a number of specific incidents are different in the 1981 film. For example, plaintiffs challenge the substitutions of the inland sea scene for the river crossing, and the Ivory King for the giant gorilla. The story with the substitutions, however, is substantially the same as it was before. In the former case, the dangers of the region and Tarzan's protection are shown in both films. In the latter case, Jane is the center of a ritualistic sacrifice to a large, grotesque figure in both films. Finally, the plaintiffs challenge the elimination of the scene in which Tarzan mimics Jane, and repeats the words "you," "me," "Jane," and "Tarzan" several times.[20] The 1981 film establishes Tarzan's inability to speak English just as effectively, though, so the story is not affected by the deletion. Furthermore, the scene was eliminated in the 1959 film, which was upheld under the 1931 Agreement in Edgar Rice Burroughs, Inc. v. Metro-Goldwyn-Mayer, Inc., supra.
 
 
 83
 Having viewed the two films, and considered the plaintiffs' objections to the 1981 film, we must conclude that no rational jury would fail to find that the 1981 film was "based substantially upon the same story" as the 1932 film without "material changes or departures." We thus conclude that MGM has satisfied the requirements of the 1931 Agreement.
 
 CONCLUSION
 
 84
 We express no opinion on whether the character of Tarzan is covered by copyright, but hold that MGM, in any event, had the right to use the character in its 1981 film. The film does not infringe the Book and does comply with the requirements of MGM's 1931 Agreement with ERB, Inc. The judgment of the district court is accordingly affirmed.
 
 NEWMAN, Circuit Judge, concurring:
 
 85
 I concur in the result and in all of Judge Kearse's comprehensive opinion for the Court, except Part IIA. The Court there holds that the plaintiffs' attempt to terminate MGM's right to use the character Tarzan in a remake of the 1932 film was ineffective because the plaintiffs' notice of termination of rights, pursuant to § 101 of the new Copyright Act, 17 U.S.C. § 304(c) (1976), which listed 35 titles including Tarzan of the Apes, omitted five other titles in which the character of Tarzan appears. In my view, omission of the five titles from the notice the Burroughs' heirs gave to Edgar Rice Burroughs, Inc. (ERB, Inc.) is irrelevant to the issues in this case, but the attempted termination of MGM's rights is otherwise ineffective because the heirs failed to give notice of termination to MGM.
 
 
 86
 1. I accept the majority's premise that the omission of the five titles from the termination notice the heirs gave to ERB, Inc. left the corporation with the same rights it would have had if the 1923 grant from Burroughs had conveyed rights in only those five titles. But I cannot agree with the conclusion that the Corporation, as grantee of copyright in the five omitted titles, would have been able to convey to MGM any right under copyright to the character Tarzan. This conclusion fails to reckon with the fundamental principle of copyright law that a proprietor's copyright protects only what is original with the proprietor or his grantor. See 1 Nimmer on Copyright § 2.01 (1981). On the assumption that the character Tarzan is sufficiently delineated to support a copyright, cf. Nichols v. Universal Pictures Corp., 45 F.2d 119 (2d Cir. 1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931), there is no dispute that the delineation was complete upon the 1912 appearance of the first Tarzan title Tarzan of the Apes. Subsequent titles, including the omitted five, contained original exploits of Tarzan, but were not original with respect to the character itself. As to the character Tarzan, the subsequent titles were sequels, "subsequent stories employing the same character( )," Goodis v. United Artists Television, Inc., 425 F.2d 397, 406 (1970) (Waterman, J., with whom Kaufman, J. joins, concurring). Without doubt, as the majority points out, the grant of rights to a work that contains material protected by the grantor's copyright in an earlier work implicitly authorizes use of all material in the granted work. The grantee of copyright in a collective work, for example,[1] can make use of all of the material in it, including a chapter originally created as a separate item and protected by the author's copyright. But the copyright protection of such use is limited to the use of the work as a collective work; it does not include authority to take a previously copyrighted chapter and deal with it as one's own. For example, the proprietor of copyright in a collective work cannot enjoy or convey to a third party, the right to publish separately, or to create a derivative work based on, a single chapter in which the author of the chapter retained his copyright interest.[2] Or, as Professor Nimmer expresses it, viewing the matter from the perspective of what interests are protectable, "(C)opyright in a derivative or collective work merely protects against copying or otherwise infringing the particular compilation of arrangement of a collective work, or the original contribution contained in the derivative work." 1 Nimmer, supra, § 3.04, at 3-12 to 3-13.
 
 
 87
 In this case, had Burroughs granted to his Corporation only the five missing titles, the Corporation could "use" each of those works as an entity. However, since the character Tarzan is not an original work of authorship in any of those five titles, the copyright proprietor of those works would have no interest under copyright law to use the character Tarzan distinct from the five stories and consequently could not convey sequel rights to MGM to create an original story, and thereafter a film and a remake, based on the character Tarzan.
 
 
 88
 When Burroughs granted to the Corporation the rights to Tarzan of the Apes, he conveyed a copyright interest in the character Tarzan.[3] Section 101(c)(6) of the Act, 17 U.S.C. § 304(c)(6), provides that upon the effective date of termination, "all of a particular author's rights under this title that were covered by the terminated grant revert" to those owning the author's interest in the extended renewal term, in this case, the heirs. At least as between the heirs and the Corporation, the termination notice, by including Tarzan of the Apes among the 35 listed titles, effectively restored to the heirs all of their copyright interest in that work, including the character Tarzan.
 
 
 89
 Even if the contract between the Corporation and MGM conveyed some rights to the character Tarzan protectable under state law concerning contracts or unfair competition, such state law cannot impair the paramount federal provision of the 1976 Copyright Act permitting an author's heirs to enjoy rights under copyright law for the 19-year extended renewal term created by the Act. Though the issue is not free from doubt,[4] I conclude that the omission of the five titles did not prevent the heirs from securing an extended renewal term to the copyright in the character Tarzan. I therefore confront the further issue of whether the heirs' failure to serve the termination notice upon MGM renders the notice ineffective to divest MGM of its license to use the character Tarzan in a remake of the 1932 film. That issue requires further consideration of the Act and the pertinent regulations.
 
 
 90
 2. The Copyright Act introduces two new provisions affording authors or their heirs a second chance to exploit the commercial value of a work in recognition of the fact that an initial grant of rights frequently fails to realize fair compensation. As to rights conveyed prior to January 1, 1978, the Act creates an extended renewal term of 19 years and permits the author or his heirs to recapture rights previously granted and enjoy them during the newly created term. 17 U.S.C. § 304(c). As to rights conveyed after January 1, 1978, the Act permits termination of the grant after 35 years and enjoyment of the recaptured rights for the balance of the term of the copyright. 17 U.S.C. § 203. Exercise of rights under either provision requires service of a notice of termination upon "the grantee or the grantee's successor in title." §§ 203(a)(4), 304(c)(4). As to § 304(c) terminations of extended term renewal rights, but not as to § 203 terminations of rights conveyed after 1978, the regulations provide an investigation procedure that will satisfy the statutory notice requirement.[5] 37 C.F.R. § 201.10(d)(2) and (d)(4) (1981). The (d) (2) provision specifies that the service requirement of the statute "will be satisfied" upon compliance with two conditions: making a "reasonable investigation" as to the current ownership of the rights being terminated, and serving the notice on the person to whom "there is reason to believe" the rights being terminated have been transferred by the grantee. The (d)(4) provision specifies that the failure to comply with the (d)(2) provision "will not affect the validity of the service."[6]
 
 
 91
 It is simply not clear from the statute or the regulations who must receive notice of termination, and the legislative history offers no guidance. The Act does not define "successor in title," a phrase appearing nowhere else in the statute. The heirs contend that "successor in title" means transferee of some exclusive right. They also contend that even if MGM were a "successor in title" by virtue of its 1931 receipt of a non-exclusive license, § 304(c) gives the person seeking to terminate rights an option to serve either the grantee, which they assert is ERB, Inc., or the successor in title. MGM contends that it is either a grantee or a successor in title and that the Act does not create an option as to service but requires service upon anyone holding whatever rights are sought to be terminated. The District Court ruled that service of notice upon MGM was required in this case because of the heirs' close connection with the Corporation and because the heirs were or should have been aware of MGM's rights. 519 F.Supp. at 393, adopting ruling made on motion for preliminary injunction, 491 F.Supp. at 1325.
 
 
 92
 The positions of the parties represent the extremes of interpretation. Under the heirs' view, an author could set up a corporation to own and license his copyright and then effectively exercise his termination rights simply by serving notice upon his corporation, without giving notice to any of the third parties to whom his corporation may have conveyed a license, an assignment of one of more of the exclusive rights of copyright,[7] or even an assignment of all the rights in the copyright. This is the result of interpreting "or" in the phrase "grantee or successor in title" to give an author's heirs a choice to serve either the author's grantee or the transferee of some or all of the grantee's rights.[8] Under MGM's view, an author who sold his copyright for a small sum and later sought to terminate rights in the extended renewal term being exercised by non-exclusive licensees of his grantee would be required to serve notice upon such licensees. Though the statute provides few guides to its meaning, I do not find either of these extreme positions consistent with the purposes of the Act.
 
 
 93
 MGM's position interprets the phrase "successor in title" to include a non-exclusive licensee of an author's grantee. Though MGM suggests, without providing a reasoned ground of distinction, that such an interpretation need not cover all the numerous non-exclusive licensees of a performing arts society, it does insist that it is a "successor in title" as a non-exclusive licensee of rights that Burroughs conveyed to ERB, Inc. This reading is not persuasive. In the absence of some indication that non-exclusive licensees were to be included, it is unlikely that Congress intended such broad coverage within a phrase that suggests ownership of rights more substantial than a non-exclusive license. Having used the words "transfer" and "license" to describe the grants subject to termination, Congress could reasonably have been expected to use the words "transferee" and "licensee" in the notice provisions if it meant to cover all persons who take any rights from the author's grantee. Some more limited meaning is suggested by the phrase "successor in title."
 
 
 94
 The pertinent regulations offer a plausible clue to interpretation. 37 C.F.R. § 201.10(d)(2), in providing for reasonable investigation of current "ownership" of the rights sought to be terminated as a means of satisfying the statutory notice requirement, refers to grounds for believing that the rights "have been transferred by the grantee to a particular successor in title." This suggests that rights capable of being transferred to a "successor in title" are those included in the Act's definition of "transfer of copyright ownership," which includes assignments and exclusive licenses and excludes non-exclusive licenses. 17 U.S.C. § 101.[9] Interpreting "successor in title" to include all assignees and exclusive licensees but to exclude non-exclusive licensees makes tolerable the notice burden upon those exercising termination rights. MGM, as a non-exclusive licensee of the right to use the character Tarzan in an original screenplay, was not required to be served as a "successor in title."
 
 
 95
 More persuasive is MGM's contention that in the circumstances of this case it should be considered for purposes of receiving notice as if it were a grantee directly from the author. The purpose of the termination provisions is to afford authors or their heirs a second opportunity to exploit rights previously conveyed at a price inadequate in light of the work's subsequent success. That purpose is not served by treating as the "grantee" for purposes of the notice provisions a family-owned corporation to which the author has conveyed his copyright. When Burroughs transferred his copyrights to ERB, Inc., he was not negotiating for value at any price, whether fair or inadequate; he was simply facilitating the marketing of rights for the benefit of himself and his family. Without question he was entitled to do this. And, though not necessary to carry out the statutory purpose, it is plausible to permit the author or his heirs to terminate rights previously granted to a family corporation. But since non-exclusive licensees of an author's grantee are left at some risk because they normally need not be served with notice of termination, that risk should be no more extensive than is required to achieve the "second chance" purpose of the terminations provisions.[10] Specifically, when an author like Burroughs has not in any realistic sense bargained away his rights by transferring them to his family corporation, non-exclusive licensees of that corporation should not bear the risk that their rights were terminated by service of notice solely upon the corporation. By giving such limited notice, the heirs were, in Judge Werker's words, "essentially serving themselves." 491 F.Supp. at 1325.[11] At a minimum, the heirs were obliged to serve MGM, as the realistic "grantee" of Burroughs, in the circumstances of this case where, as Judge Werker ruled, the existence of MGM's rights was or should have been well known to the Burroughs heirs who signed the notice. In 1962, their family corporation was involved in prior litigation with MGM concerning MGM's first remake of the 1932 film, Edgar Rice Burroughs, Inc. v. Metro-Goldwyn-Mayer, Inc., 205 Cal.App.2d 441, 23 Cal.Rptr. 14 (2d Dist. 1962). I conclude that termination of MGM's rights under copyright, conveyed under the 1931 contract, required service of the notice of termination upon MGM. For lack of such service, the heirs failed to recapture from MGM its sequel right to use the character Tarzan in a remake of the 1932 film.
 
 
 
 *
 Honorable Warren W. Eginton, of the United States District Court for the District of Connecticut, sitting by designation
 
 
 *
 As published in The All Story, the Book has several incidents involving "Sabor, the tiger." See 24 All Story at 260-61, 274, 286, 306-07. ("Sabor" was the generic name Burroughs applied to all tigers.) At some point these passages were revised (possibly when Burroughs discovered that tigers were not native to Africa), for in the current edition of the book the same incidents involve "Sabor, the lioness." See the "Authorized Edition" published by Ballantine Books (First Printing: July 1963) at 36-37, 61, 83-84, 120-21. Only the All Story version was before the district court, and so far as we can tell from the record, only the All Story version is covered by copyright. Despite Burroughs's second thoughts, therefore, it is with the All Story version that we must deal
 
 
 [2]
 Porter discusses fifteenth century Spanish history while lost in the jungle, and reacts to the threat of an approaching lion with the statement, "Never, Mr. Philander, never before in my life have I known one of these animals to be permitted to roam at large from its cage. I shall most certainly report this outrageous breach of ethics to the directors of the adjacent zoological garden." 24 All Story at 308
 
 
 [3]
 Paragraph 3 of the Agreement provided that Burroughs would "carefully examine( ) and read" the script, and point out any similarities between it and any of the books he had written. This provision was apparently included to ensure that MGM did not infringe any copyright interests already granted by Burroughs. The claimed similarities noted by Burroughs are discussed more fully in Part II.B. infra
 
 
 [4]
 The swimming scene dialogue is as follows:
 Jane (one arm around Tarzan's neck, the other stroking his hair) What color are your eyes? Yes, I know-the color of the forest-gray-green. I wonder what you'd look like dressed? Pretty good! You'd be a great success in London. And I believe you'd love it!
 Tarzan (mimicking her) Love it!
 Jane Oh, would you! Women are such fools-they'd spoil you.
 Tarzan (mimicking her) Spoil!
 Jane I don't think you'd better look at me like that-far too attractive. (Pause) I love saying things to a man who can't understand. Who doesn't even know what kisses are!
 Tarzan Love it!
 Jane I daresay you would
 
 
 [5]
 Section 102 of the Act, 90 Stat. 2598, provided that the Act became "effective on January 1, 1978, except as otherwise expressly provided."
 
 
 [6]
 17 U.S.C. § 304(c) provides, in relevant part:
 In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by (inter alia, the author) is subject to termination under the following conditions:
 (1) ... In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, ... if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.
 (2) Where an author is dead, his or her termination interest is owned, and may be exercised, by his widow or her widower and his or her children or grandchildren as follows:
 (B) (if there is no widow or widower) the author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest ...;"
 (C) the rights of the author's children and grandchildren are in all cases divided among them and exercised on a per stirpes basis according to the number of such author's children represented....
 (3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.
 (4) The termination shall be effected by serving an advance notice in writing upon the grantee or the grantee's successor in title.... In the case of a grant executed by one or more of the authors of the work, the notice as to any one author's share shall be signed by that author or his or her duly authorized agent or, if that author is dead, by the number and proportion of the owners of his or her termination interest required under clauses (1) and (2) of this subsection, or by their duly authorized agents.
 (A) The notice shall state the effective date of the termination, which shall fall within the five-year period specified by clause (3) of this subsection, and the notice shall be served not less than two or more than ten years before that date. A copy of the notice shall be recorded in the Copyright Office before the effective date of termination, as a condition to its taking effect.
 (B) The notice shall comply, in form, content, and manner of service, with requirements that the Register of Copyrights shall prescribe by regulation.
 (5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.
 (6) ... In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date to termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:
 (A) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.
 (B) The future rights that will revert upon termination of the grant become vested on the date the notice of termination has been served as provided by clause (4) of this subsection.
 (E) Termination of a grant under this subsection affects only those rights covered by grant that arise under this title, and in no way affects rights arising under any other Federal, State, or foreign laws.
 (F) Unless and until termination is effected under this subsection, the grant, if it does not provide otherwise, continues in effect for the remainder of the extended renewal term.
 
 
 [7]
 The relevant regulations provide as follows:
 A notice of termination must include a clear identification of each of the following:
 (i) The name of each grantee whose rights are being terminated, or the grantee's successor in title, and each address at which service of the notice is being made;
 (ii) The title and the name of at least one author of, and the date copyright was originally secured in, each work to which the notice of termination applies; and, if possible and practicable, the original copyright registration number;
 (iii) A brief statement reasonably identifying the grant to which the notice of termination applies.
 
 
 [37]
 C.F.R. § 201.10(b)(1)(i)-(iii) (1980)
 
 
 [8]
 Plaintiffs also moved unsuccessfully to amend the complaint to state claims for trademark infringement. The district court's refusal to allow such new claims was not an abuse of discretion, and, in any event, our conclusion here that the 1981 film was authorized by the 1931 Agreement precludes such claims
 
 
 [9]
 In their brief on appeal plaintiffs objected that the district court had "injected itself into the editing process." (Appellants' Brief at 41.) Defendants likewise objected, stating that they were "as distressed as plaintiffs (for obviously different reasons) about Judge Werker's intrusion into the editing process." They observed that "(t)he matter of any court's willingness to order cuts in a motion picture raises a sensitive issue ...." (Appellees' Brief at 8 & n.) We agree that the district court normally should not assume the role of film editor. Since MGM did not appeal the issue, however, no question regarding restoration of the cuts is before us
 
 
 [10]
 The position taken by plaintiffs at the oral argument of this appeal indicates that even the efficacy of plaintiffs' argument that ERB, Inc., granted MGM a license to use a copyrighted character depends on their contention that MGM based the 1932 film on the Book. The following colloquy occurred in response to a question from Judge Newman as to whether any case had held a literary character infringed based on the character's attributes, regardless of any traditional lifting of story line:
 MR. ZISSU (plaintiffs' counsel): That is not the issue. The issue isn't whether the character has been infringed, your Honor, but whether the literary work has been infringed.
 JUDGE NEWMAN: I thought your argument was what has been conveyed is a copyright interest in the characters.
 MR. ZISSU: No, what has been conveyed is a right under copyright in the literary work, Tarzan of the Apes.
 JUDGE NEWMAN: The 1912 story.
 MR. ZISSU: Yes.
 JUDGE NEWMAN: Wait a minute. What I am trying to get at is what is it a copyright grant in. I thought we were talking about a copyright grant in the characters?
 MR. ZISSU: No, we are not.
 JUDGE NEWMAN: We can put that aside.
 MR. ZISSU: Put that aside.
 JUDGE NEWMAN: Your case stands or falls on whether this contract grants MGM a copyright license to the story of the 1912 version?
 MR. ZISSU: Yes.
 JUDGE NEWMAN: Is that it?
 MR. ZISSU: No, not the story. Whether it grants a right that is protected under the copyright laws to use literary expression contained in the 1912 story....
 (Tr. 14-15.)
 
 
 [11]
 Our conclusion that there was no termination of MGM's right to use the character "Tarzan" moots MGM's cross appeal, which asks us to hold that the character, at least as it appears in Burroughs's books, is not sufficiently well-delineated to be copyrighted. If "Tarzan" is not copyrightable, ERB, Inc.'s grant of the right to use the character was not a right under copyright, and thus was not subject to termination under 17 U.S.C. § 304(c). As defendants note in their brief, this issue would become relevant if MGM were to seek to produce a third remake of Tarzan, the Ape Man before 1987 (when the Book will enter the public domain) because the heirs have sent a "Second Notice of Termination" that MGM concedes is adequate to terminate their rights under the 1931 Agreement to the extent those rights are terminable. (Appellees' Brief at 16.) The possibility of a third remake, however, is not the case presently before us
 
 
 [12]
 Alternatively plaintiffs claim that the continued availability to MGM of the five unterminated titles is irrelevant because MGM in fact based the 1932 film, and hence the 1981 film, on the Book, as to which notice of termination was given:
 (I)n 1932 MGM copied from TARZAN OF THE APES and did not choose to copy from any of the other stories. As a result, its 1981 remake has nothing to do with the five titles not covered by the December 1977 notice of termination.
 (Appellants' Reply Brief at 26.) Indeed, plaintiffs appear to construe the 1931 Agreement as having given MGM the right to use not just Burroughs's characters but also his stories. Thus, their main brief states as follows:
 MGM is today no longer permitted to use any of the stories as it was in 1931. Since the 1932 film is based on TARZAN OF THE APES which is covered by the notice, that is the only relevant work on the list.
 (Appellants' Brief at 34-35; emphasis in original.) And in their reply brief, plaintiffs argue that since the heirs' notice of termination mentioned Tarzan of the Apes, it cut off the rights to use that work "upon which the original and all remakes must be based." (Appellants' Reply Brief at 26.) Such a construction is at odds with the plain and unambiguous language of the 1931 Agreement, see Part I.B. supra, which merely gave MGM the right to use Burroughs's characters in an original story to be created by MGM. Plaintiffs' contention that the 1932 film was based on the Book is dealt with in Part II.B. below.
 
 
 [13]
 One might perhaps have expected the plaintiffs to contend directly, in light of the issues in this lawsuit, that the 1981 film is based on the Book. However, by mounting an indirect attack, in which the major premise is that the 1932 film is based on the Book, plaintiffs apparently hoped to impale MGM with a "Morton's Fork": either the 1981 film followed the 1932 film, thereby infringing the Book, or the 1981 film did not follow the 1932 film, thereby breaching the 1931 Agreement. Even if plaintiffs' major premise were sound, which our discussion in the text, infra, demonstrates it is not, MGM was not necessarily forced into the dilemma that plaintiffs seek to create. Since the standard by which we judge the similarity of film to Book is not the same standard by which we must judge the similarity between the two films, see Part III, infra, the Fork is flawed by the fact that its tines are not true opposites. Thus the possibility remained that for its new remake MGM could eliminate the arguably infringing elements of the 1932 film in a way that did not substantially alter the story, thereby complying with both the copyright law and the 1931 Agreement. As it happens, this may have been the course MGM followed. Most of the specific incidents in the 1932 film that plaintiffs claim were taken from the Book, i.e., Holt's killing of the ape, Tarzan's killing of the lion with a stranglehold, and Holt's asking Jane if she can use a gun, are not in the 1981 film
 
 
 [14]
 We recognize, of course, that a copyright infringement may occur by reason of a substantial similarity that involves only a small portion of each work. Our discussion in the text reveals that even as to the segment of the Book that recounts Tarzan's relationship with Jane, the 1932 film is not so similar that it would have infringed, absent a license, the Book's copyright
 
 
 [15]
 Given that the film ape is not Kala, Tarzan's grief at the film ape's death finds no parallel in the Book. He certainly shows no grief at the deaths of any other members of his tribe. Indeed, in the Book, Tarzan is so "inured ... to the sight of dead and dying animals," that he spends long hours in his cabin with the skeletons of Lord and Lady Greystoke in plain view, and we are told that it would not have moved him greatly to know that he was looking at the remains of his own father and mother. 24 All Story at 263
 
 
 [16]
 Although Holt survives unharmed in the film, Tarzan begins killing the native bearers, perhaps in retaliation for the ape's death. But even this is ambiguous
 
 
 [17]
 Because of the different contract standard, and because substantially the same story may be told in different ways, MGM's 1981 film could have complied with the 1931 Agreement without infringing the Book even if the 1932 film would have, absent the license, infringed the Book. In Sheldon v. Metro-Goldwyn Pictures Corp., supra, 45 F.2d 119, for example, we noted that the novel Letty Lynton and the play Dishonored Lady were based on the same historical incident, but it was clear that neither was an infringement of the other. Every day different newspapers publish different articles that are "based substantially upon the same story," but rarely is the manner of articulation so similar that copyright interests are implicated
 
 
 [18]
 Plaintiffs argue that P 8 of the Agreement, which prohibits MGM from "depict(ing), portray(ing) or describ(ing) any character appearing in any story written by (Burroughs) as killed, crippled, or disfigured, unless such character, or a similar character, is so depicted, portrayed or described in any story heretofore written by (Burroughs)," and P 9, in which MGM "agrees to give (Burroughs) the usual credit on the screen and in all paid advertising and publicity," serve to emphasize the importance of the characterizations. They suggest that this somehow "mak(es) clear the underlying requirement that the characters, as used by MGM in the first 1932 film ..., could not be changed in future remakes." (Appellants' Brief at 36-37 & n.47) There is no express requirement, however, that the characterizations be substantially the same in the two films and PP 8 and 9 do not suggest an implied requirement. Indeed, the conditional requirement that MGM may not kill, cripple, or disfigure any character in Burroughs's stories suggests that variations of any other sort are permissible. Furthermore, the characterization of the 1981 film to which the plaintiffs most strongly object is that of Parker-and Parker was not one of Burroughs's characters, and thus not within the scope of PP 8 and 9
 
 
 [19]
 If the setting were changed to present-day New York, for example, the story would necessarily be different, for the incidents of the film would have to be different in the new setting. Similarly, if Tarzan's characterization were changed to a selfish monster the story would be necessarily different, for his actions in the film would have to be different to be consistent with his new character. Less drastic changes in setting or characterization, however, would not necessarily require a substantial change in the story
 
 
 [20]
 Contrary to popular belief, the line "Me Tarzan, you Jane," (or, as it is sometimes quoted, "You Tarzan, me Jane") does not appear in the 1932 film. The actual dialogue is as follows:
 (Tarzan causes an ape that has frightened Jane to leave her alone.)
 Jane Thank you. (Tarzan does not respond.)
 Thank you for protecting me.
 Tarzan (mimicking her) Me?
 Jane I said thank you for protecting (pointing to herself) me.
 Tarzan (tapping her on the chest) Me.
 Jane No. (pointing to herself) I'm only me for me.
 Tarzan (tapping her) Me!
 Jane No. (pointing to him) To you I'm you.
 Tarzan (tapping himself on the chest) You?
 Jane No. (pause) I'm Jane Parker. Understand?
 Jane. (pointing to herself) Jane.
 Tarzan (tapping her) Jane.
 Together (Tarzan taps her) Jane.
 Tarzan (tapping her) Jane.
 Jane (nodding) Yes, Jane.
 Jane (pointing to him) You? (Tarzan does not respond. She points to herself.) Jane.
 Tarzan (tapping her) Jane.
 Jane (pointing to him) And you? You?
 Tarzan (tapping himself) Tarzan. Tarzan.
 Jane (slowly) Tarzan.
 Tarzan (alternately tapping her and himself, harder and harder each time) Jane. Tarzan. Jane. Tarzan. Jane. Tarzan. Jane. Tarzan. Jane. Tarzan. Jane. Tarzan. Jane....
 Jane (exasperated) Oh, please stop. Let me go. I can't bear this. (realizing he cannot understand) Oh, what's the use?
 
 
 [1]
 A collective work, which by definition contains separate "works" capable of supporting a copyright interest, 17 U.S.C. § 101 (1976), is not precisely analogous to a subsequent Tarzan story containing the character Tarzan, because the original new exploits and the unoriginal character are not "separate and independent" works within the definition of a "collective work." Nevertheless, for analytical purposes, the analogy is close enough to warrant consideration of the use a grantee of copyright in a collective work (or a derivative work) can make of the unoriginal portions contained within the collective work
 
 
 [2]
 Cf. G. Ricordi & Co. v. Paramount Pictures, Inc., 189 F.2d 469 (2d Cir. 1951), in which the plaintiff, proprietor of copyright in an opera derived from a copyrighted novel, was prevented from asserting motion picture rights to the opera to the extent that such rights would infringe the copyright in the novel. The proprietor "is not entitled to make general use of the novel for a motion picture version of (the novel); it must be restricted to what was copyrightable as new matter in its operatic version." Id. at 471
 
 
 [3]
 There is no occasion in this litigation to consider the intriguing question whether a grant of rights to a book in which a well-delineated character first appears constitutes a relinquishment by the author of his own "sequel" rights to reuse his original character, or whether, at least as between the creator of a character and the creator's grantee, an author retains his own sequel rights, in addition to sequel rights conveyed to his grantee, at least in the absence of an explicit relinquishment of such personal rights
 
 
 [4]
 See 3 M. Nimmer, Nimmer on Copyright, P 11.06(B), at 11-40 n.33 (1981), suggesting that the District Court "may have been correct" in concluding that omission of the five titles did not effectively terminate MGM's right to use the character Tarzan. Professor Nimmer notes that the "grant" was only as to the right to use the characters but not the stories in which they appeared. The grant, as contained in the 1931 contract, effectively conveyed to MGM the right to use the characters because the grantor, ERB, Inc., held rights to all of the works in which each of those characters made a first appearance. The fact that the grant to MGM concerned only use of characters does not determine whether any right under copyright to such characters was conveyed by referring in the grant to the five titles in which Tarzan and some of the other characters did not first appear
 
 
 [5]
 Application of the "reasonable investigation" provision only to § 304(c) terminations has been characterized by a noted commentator as "rather odd." 3 Nimmer § 11.06(B), at 11-39 n.29.3. Perhaps the Copyright Office was recognizing that an author making grants before 1978 could not be expected to anticipate the new Act's extended renewal term provision and therefore had no reason to make any provision in his grant requiring his grantee to inform him or his heirs of the identity of transferees of the grantee on whom notice should be served. Grants made after 1978, subject to termination under § 203, could include such provisions; hence the ameliorating effect of the "reasonable investigation" technique for complying with the notice requirement was not as necessary
 
 
 [6]
 It is not readily apparent what the Copyright Office had in mind in providing that serving a termination notice upon a transferee of rights identified by reasonable investigation will satisfy the service requirement of the statute and also providing that not serving the notice upon such a transferee will not affect the validity of the service. Perhaps the (d)(4) provision means that failure to investigate the existence of transferees and serve those identified does not affect the validity of the service that has been made upon the initial grantee, but that such failure renders the notice ineffective to terminate the rights held by the grantee's transferee
 
 
 [7]
 The heirs express doubt that the holder of rights subject to termination could own less than all of the rights included in a grant of copyright, relying on the pre-Act doctrine of indivisibility of copyright. But "successor in title" cannot mean only a person owning all rights in a copyright because the same phrase is used in § 203(a)(4) to describe the recipient of notice of termination of post-1978 grants, which clearly are divisible, 17 U.S.C. § 201(d)(2) ("Any of the exclusive rights comprised in copyright ... may be transferred ... and owned separately")
 
 
 [8]
 Whatever the meaning of "grantee" and "successor in title" in the notice termination provision, it seems evident that their expression in the disjunctive was intended to cover various contingencies, not to afford those exercising termination rights a choice as to whom to serve. The statute is sensibly read to mean that notice is to be served (a) on the grantee, if the grantee has retained all rights originally conveyed, (b) on the transferee, if the grantee has conveyed all rights to a transferee, or (c) if only some rights have been conveyed, on the grantee or the transferee (or both) depending upon which rights are sought to be terminated. See 3 Nimmer § 11.06(B), at 11-39 to -40
 
 
 [9]
 The regulation also makes clear that a "successor in title" is someone to whom rights have been transferred by the grantee, thereby precluding a narrow interpretation that would limit the phrase to those who succeed to rights only by inheritance
 
 
 [10]
 The heirs contend that whatever risk non-exclusive licensees of an author's grantee face in having their rights terminated without service of notice upon them is satisfactorily minimized by constructive notice. The Act requires that notice of termination "shall be recorded in the Copyright Office before the effective date of termination, as a condition of its taking effect," § 304(c)(4)(A), and provides that proper recordation "gives all persons constructive notice of the facts stated in the recorded document," § 205(c). While constructive notice has to be relied upon by non-exclusive licensees from a grantee to whom the author bargained away his copyright, there is no reason to press the statutory scheme to its limit and rely on constructive notice for a non-exclusive licensee like MGM, which is realistically as entitled to actual notice as if Burroughs had conveyed the license directly to it, instead of using the intermediary of his family corporation
 
 
 [11]
 Requiring actual notice to all licensees from an author's family corporation does not detract from the legitimacy of the corporation for all of the normal purposes of corporation law. It simply disregards the corporate structure for the limited purpose of determining proper recipients of notice under a novel statute that permits return to an author or his heirs of rights previously conveyed